[No. 53890-0-I.   Division One.   September 16, 2005.]

FRANK CALLFAS ET AL., *Appellants*, v. THE DEPARTMENT OF CONSTRUCTION AND LAND USE OF THE CITY OF SEATTLE ET AL., *Respondents*.

580

*Philip A. Talmadge* and *Emmelyn Hart-Biberfeld* (of *Talmadge Law Group, P.L.L.C.*), for appellants.

*Thomas A. Carr, City Attorney,* and *Roger D. Wynne, Assistant,* for respondents.

*Russell C. Brooks* and *Samuel A. Rodabough* on behalf of Pacific Legal Foundation and Building Industry Association of Washington, amici curiae.

¶1 KENNEDY, J. — The Callfases submitted an application for a Master Use Permit (MUP) to the city of Seattle's (City) Department of Construction and Land Use (DCLU) on June

24, 1999. There were several changes in the DCLU planners assigned to the application, and these planners issued multiple correction notices to which the Callfases responded. By late 2002, the MUP had still not been issued. The Callfases filed a claim for damages with the City on November 26, 2002. The City denied their claim on February 27, 2003, and the Callfases filed suit in King County Superior Court on March 6, 2003. They alleged that the City's decision to refuse to act on their MUP application was arbitrary and capricious and caused them significant damages. They claimed damages under 42 U.S.C. § 1983 and chapter 64.40 RCW.

¶2 Seattle finally issued the Callfases' MUP on May 29, 2003. Meanwhile, the City had removed the case to Federal District Court, and the parties pursued discovery. On July 29, 2003, the federal court remanded the case to superior court on joint motion of the parties after the Callfases nonsuited their § 1983 claim. The City then filed a motion for summary judgment claiming that the Callfases' original suit was barred by the limitations period in RCW 64.40.030. The trial court agreed and dismissed the action. The Callfases appeal.

¶3 We conclude that the definition of "act" in chapter 64.40 RCW precludes a party aggrieved by municipal administrative delay from filing suit under the statute unless the municipality has either refused to act or made a final decision on the application or has exceeded the legal time limits for processing the application. The term "failure to act" in the statute does permit recovery of delay damages. But it is inextricably tied to some action by the City which causes the clock to begin to run on the statute's 30-day limitation period. Because the Callfases filed suit before the City issued the MUP and do not allege a violation of the processing time limits, the trial court properly dismissed their claim under chapter 64.40 RCW.[1]

---

[1] Because they voluntarily dismissed their claim under 42 U.S.C. § 1983 and the three-year statute of limitations has not run on that cause of action, they may be

## FACTS

¶4 The Callfases' June 1999 MUP application was for a multiuse building including residential and retail uses and related parking. The application languished until June 13, 2000, when Kathi Williams, the new project architect from PKJB Architectural Group, wrote a letter to Paul Janos, a DCLU planner who had taken over the Callfases' application from Colin Vasquez. The letter said PKJB was preparing revisions to the project, including a four-foot commercial height bonus to obtain nine-foot ceiling heights and included diagrams of plans at the increased height. Williams sent another letter to Janos on July 11, 2000, which addressed the four-foot commercial height bonus and contained a sketch showing the proposed building with the height bonus in relation to an existing building. The letter also stated that Williams believed PKJB and the Callfases did not need to file an exemption from the steep slope and landslide prone area requirements (environmentally critical area (ECA) exemption) because there was previous construction on the site.

¶5 On August 14, 2000, Janos sent Williams and PKJB the first DCLU correction notice for the project stating that the proposed plan "substantially exceeds the height limit." The letter also stated there were "numerous other substantial code and critical areas issues to address" and provided a long list of required corrections, including: the height of the planned building; identification of a "40-foot height limit envelope on all elevations . . . showing the 5-foot slope bonus and discretionary 4-foot additional height"; provision of required parking spaces; revision to show open space calculations; identification of ECA slopes of 30-40 percent on the site; and identification on the plan of all trees that had been cut.

¶6 Williams responded to this first correction notice on August 29, 2000. Her letter said building elevations were

_____

able to pursue their damages action under the federal statute. *See, e.g., Hayes v. City of Seattle*, 131 Wn.2d 706, 712-13, 934 P.2d 1179 (1997).

reduced, there was a zoning envelope for each elevation, parking was included at a rate of one space per unit, open spaces were now highlighted and a summary of space provided on each floor plan, no trees had been removed, and that they had requested an ECA exemption.

¶7 Janos sent Williams a second correction notice in October of 2000. This one included a longer list of corrections than the first one. Among other things, the City wanted a diagram for calculating the slope bonus; sufficient parking spaces based on the University Overlay Parking enhanced parking requirements; proper percentage of the street-level facade reserved for nonresidential uses; diagrams and calculations for the lot coverage above 13 feet in height; landscaping plans; lighting details; location of heating, ventilation, and air-conditioning (HVAC) equipment; information on solid waste and recyclable material storage space; a building grade sheet; and a "design matrix" document describing all requested "departures" along with the standard requirements. The notice also took issue with the ECA exemption, referring to a prior e-mail between Janos and Williams. Finally, it said the proposed design still did not comply with applicable height limits. Janos made specific suggestions about measuring the elevations and marking them with contour lines on the plan. He said "[p]erhaps it is a good idea to sit down and talk about some of the things needed to get the building to move toward compliance in this regard." Clerk's Papers at 617.

¶8 Williams initially responded to this notice by e-mail on October 27, 2000. She asked if Janos and she could meet to discuss the height issue because she thought she was very close to resolving it. Williams asked for more time to formally respond to this second DCLU correction notice and then replied in full to the notice on January 9, 2001. This response contained a "design matrix" of the project requirements and the requested departures and indicated that PKJB believed two of the requested departures were pre-

viously approved.[2] This response also included further height revisions, garage enlargement and increased commercial frontage, a landscape plan, information on lighting, HVAC, and solid waste/recycling space. Williams stated that the ECA exemption request was approved and included a letter from a geotechnical engineer.

¶9 The record contains numerous communications between Williams and Janos from October 2000 and February 2001, where the two attempted to reach an agreement on project requirements, including the ECA exemption, parking, and the building height and grade sheet.

¶10 On February 28, 2001, there was an earthquake in Seattle. Janos e-mailed Williams on March 6, 2001, indicating that the project's zoning review was "next on my agenda," but that project plans had been inaccessible for two days after the earthquake. Janos said he had asked that the plans be moved to another building, but they had disappeared. He said he was sure the plans would turn up soon, but that he could not make any progress until they did.

¶11 Between March 6, 2001, and October 2001, Janos continued to bill for his time on the Callfas MUP application. Although there are references to three additional correction notices DCLU sent during this time—March 22, 2001, June 27, 2001, and July 19, 2001—they are not included in the record on appeal. An internal DCLU e-mail from Janos on August 15, 2001, says that the Department told PKJB the project would be cancelled if they did not respond to the June 27, 2001 correction notice by July 27, 2001. DCLU sent another correction notice on July 19, 2001 even though it had not yet received revised plans in response to the earlier notices.

¶12 An early September 2001 e-mail interchange between Lisa Winterhalter, the new project manager/architect at PKJB, and Janos shows that DCLU officials were

---

[2] The applicant had met with the Design Review Board early in the application process, and the Board had voiced its agreement with the departures based on the location and configuration of the site. These approved departures, among others, were included in the MUP the City issued on May 29, 2003.

still discussing the project. Winterhalter asked to meet with Janos. Soon afterward, Janos recommended that DCLU cancel the project because all the correction notices had expired. In an e-mail exchanged in early October 2001, Winterhalter told Janos that PKJB had submitted responses to the fifth correction notice on September 11, 2001. Copies of this correction notice and response are also not in the record.

¶13 In the e-mails, Winterhalter said that she was concerned that DCLU would cancel the project and that she was available to meet. Janos responded that he had not yet looked at the PKJB responses, but that DCLU was unlikely to cancel the project unless the submitted revisions continued to have height limitation problems. Winterhalter again requested a meeting, but Janos would not agree because he was still looking for suggestions from other DCLU employees. In internal DCLU e-mails during this time about canceling the project, Janos strongly suggested canceling the application because the project remained substantially incomplete after five correction notices. Specifically, Janos said the building continued to be over height limits and the parking was insufficient under the University Overlay Parking standards.

¶14 On October 8, 2001, Vicki Callfas e-mailed Janos to ask about the application and request a meeting with him. Janos said he had had numerous contacts with the Callfases' project representatives since March 2001, DCLU had made four requests that the project comply with height requirements, and he had informed Winterhalter as recently as August 29, 2001, that project cancellation appeared warranted. He further stated that the latest plan submittal, dated September 11, 2001, did not address his height concerns. In order to satisfy parking requirements, the architect had relabeled two bedrooms as "office/den." This, he said, eliminated his remaining misgivings about recommending cancellation. Janos told Ms. Callfas the project had indeed been cancelled, but he would meet with her and Winterhalter to discuss options. Winterhalter got a

letter dated October 10, 2001, notifying her that the application was cancelled.

¶15 PKJB appealed the cancellation notice, and the application was reinstated in February 2002. Another DCLU planner with expertise in code compliance, Alan Oiye, examined the plans and determined that they in fact did meet the applicable height standards. Other DCLU reviewers agreed with Oiye's determination. The project was briefly assigned a new DCLU planner, Dawn Bern. PKJB learned that Bern was taking a leave of absence and they would again be assigned to a new planner. On June 6, 2002, another DCLU planner, Bob McElhose, agreed with PKJB that the project was not subject to the enhanced University Overlay Parking and the revised plans again could include the second bedroom.[3] In July 2002, at DCLU's request, PKJB resubmitted a new MUP application under the same number as the original application and had to have a new MUP intake appointment.[4]

¶16 In November 2002, the Callfases had not yet received their MUP, so they filed a claim for damages with the City. The claim alleged that the City's delay and mismanagement of their application violated the right to a timely decision under RCW 64.40.020 and their constitutional rights under 42 U.S.C. § 1983. They sought "reimbursement for the delay and expenses caused by the City's arbitrary and capricious conduct." While the claim was pending, DCLU issued another correction notice on the project on December 6, 2002. This notice repeated many of the requests from previous notices, but added new requests for parking garage lighting schematics, and diagrams of property setbacks and street right-of-way widths. PKJB responded to this notice on January 8, 2003, detailing their response to each request. The City denied the Callfases' claim for damages on February 27, 2003.

[3] PKJB had asserted from the beginning that the property fell outside the Overlay Map and required only one space per unit.

[4] It appears from internal e-mails that the reason for requiring a new application and intake meeting was to allow DCLU to charge its new $250/hour plan review rate. Based on the 1999 application, the rate had been $175/hour.

¶17 On March 6, 2003, they filed suit against DCLU and the City in King County Superior Court outlining the chronology of and frustration with their MUP application process. They asserted the following claims:

▪ The DCLU decision to withhold a master use permit was arbitrary and capricious, proximately resulting in significant delay damages to the Callfases.

▪ Seattle's failure to issue a master use permit to the Callfases frustrated their efforts to proceed with the development of their property and constitutes a violation of RCW 64.40.

▪ DCLU's failure to issue a permit wrongfully deprived the Callfases of their constitutional rights with respect to their property pursuant to 42 U.S.C. § 1983.

Clerk's Papers at 3-4. The Callfases asked for an injunction requiring the City to issue the MUP for the project and damages, costs, and reasonable attorney fees. The City answered on May 12, 2003, raising several affirmative defenses including that "[t]he Callfases' claims, or some of them, are barred by applicable limitations periods." Clerk's Papers at 132.

¶18 The City removed the case to federal court, but in July 2003 it was remanded by agreement of the parties to state court after the Callfases voluntarily withdrew their 42 U.S.C. § 1983 claim. The City approved the Callfases' MUP on May 29, 2003.[5] Their Second Amended Complaint alleged no new causes of action other than those raised in their original suit: damages under chapter 64.40 RCW for the City's arbitrary and capricious failure to issue the MUP. The City answered, again asserting the statute of limitations as an affirmative defense.

¶19 The City filed a motion for summary judgment on December 19, 2003, asserting that the limitations period in RCW 64.40.030 barred the suit. That section states that

---

[5] The approved MUP did not differ in any significant way from the plans PKJB had submitted. Janos' three primary objections throughout this long process—height, parking and ECA compliance—were all resolved in favor of the Callfases once someone else in DCLU actually examined the plans.

any actions for damages under chapter 64.40 RCW "shall be commenced only within thirty days after all administrative remedies have been exhausted." After a continuance for depositions and settlement negotiations over the fees the City charged to process their MUP application, the Callfases responded to the City's summary judgment motion, arguing only that the City had waived its right to bring a motion based on RCW 64.40.030's statute of limitations.

¶20 The trial court granted the City's motion for summary judgment and issued a letter decision on February 23, 2004. The court found that under the circumstances of the case, the City had neither waived the defense of subject matter jurisdiction nor was it estopped from asserting it at summary judgment. The court also addressed the argument that the Callfases had failed to meet the statutory limit for filing their suit:

> In the end, I found myself in agreement with the City Attorney's analysis of the language, structure and policy of the statutes in question: RCW 64.40.010(6), 64.40.020(1) and 64.40.030. A lawsuit asserting a claim under these statutes must seek relief from an "act" of an agency and be commenced within 30 days of the exhaustion of any administrative remedies. Such a challenged "act" may be the denial of a permit application or the attaching of conditions to the issuance of a permit. It can also be the act of taking no action on an application at the point at which other laws require that action be taken. When the challenged act is of the first type, a true *action*, the 30 period for filing suit commences on the day of that action (or the day administrative remedies are exhausted). When the challenged act is of the latter type, the act of *failing to act*, the period must commence on the day on which, by operation of law, an action becomes tardy.

> I believe it was Walter Johnson who offered the wise observation: "they can't hit what they can't see." There is, of course, a *real* concern that a pattern of administrative obfuscation and unjustified delay could leave a wronged applicant without a remedy since there would be no final act at which to time a swing. However, it would not be appropriate to seek to redress

this possibility by declaring a limitless right to challenge, at any time, such conduct as being arbitrary and capricious. It is consistent with the law and sound policy to require a claimant to take timely action to redress untimely inaction by an administrative agency. To hold otherwise would risk creation of an exception that would quickly swallow up the rule I believe the legislature intended to create.

Clerk's Papers at 833-34.

## DISCUSSION

### A. *Waiver of Affirmative Defense*

■ ¶21 The Callfases argue, as they did below, that the City waived its right to assert the RCW 64.40.030 statute of limitations defense by engaging in settlement and discovery for several months before asserting it. A defendant who preserves a defense in his or her answer does not waive that defense. *Lybbert v. Grant County*, 141 Wn.2d 29, 44-45, 1 P.3d 1124 (2000). Here, the City raised the defense in its answer to the Callfases' initial complaint by stating "[t]he Callfases' claims, or some of them, are barred by applicable limitations periods." Clerk's Papers at 132. The City continued to assert this defense when it answered the second amended complaint.

¶22 A court may still find a waiver where a defendant knew of a defense but lies in wait, proceeding with discovery until the statute of limitations expires. For example, in *Lybbert*, 141 Wn.2d at 44-45, the court held the defendant had waived the defense of insufficient service of process by not alleging it in the initial answer and by engaging in discovery for several months while the statute of limitations on perfecting service expired. However, that is not what occurred in this case. Here, the statute of limitations had either run by the time the Callfases filed their claim or it had not. Nothing the City did, including discovery and negotiations, could have caused it to expire. Under those circumstances, the exception discussed in *Lybbert* does not apply, and the trial court properly found there was no waiver.

## B. *Claims for Damages under chapter 64.40 RCW*

¶23 The primary issue on appeal is whether the trial court properly ruled that the Callfases' suit was barred by RCW 64.40.030's 30-day limitation period. Chapter 64.40 RCW provides permit applicants with a claim for damages against a government entity for unreasonable delay or arbitrary decisions on land use permit applications. The City argues that the trial court properly ruled that there is no "continuing violation" or "continuing delay" cause of action under chapter 64.40 RCW because all claims must be filed within 30 days of the "act" which allegedly caused the damage. Here, they assert, there was no act alleged, and the Callfases suit is either premature or too late.

¶24 The Callfases argue that the City's continued failure to issue their MUP over a period of four years was arbitrary and capricious and the delay is a continuing violation under chapter 64.40 RCW. They contend they may bring this claim, despite the time limits set forth in RCW 64.40.030, "at any point in time during the period in which the [C]ity delayed issuing the MUP, so long as they could prove the delay was arbitrary, capricious, or unlawful." The Callfases assert that to hold otherwise "would permit Seattle, as the wrongdoer, to continue delaying issuance of the MUP as long as it desired because the claim had not 'accrued.' "

¶25 Amici for the Pacific Legal Foundation and the Building Industry Association of Washington argue, in support of the Callfases, that a cause of action under chapter 64.40 RCW may exist where a governmental entity either fails to act on or issue a land use permit within time limits established by law or arbitrarily and capriciously delays issuing a permit. Amici also suggest time limits for this court to consider in determining when the RCW 64-.40.030 statute of limitations began to run in this case.

¶26 Statutory interpretation is a question of law which we review de novo. *W. Telepage, Inc. v. City of Tacoma Dep't of Fin.*, 140 Wn.2d 599, 607, 998 P.2d 884 (2000). "In interpreting a statute, we do not construe a statute that is unambiguous." *Whatcom County v. City of Bellingham*, 128

Wn.2d 537, 546, 909 P.2d 1303 (1996) (citing *Food Servs. of Am. v. Royal Heights, Inc.*, 123 Wn.2d 779, 784-85, 871 P.2d 590 (1994)). However, if the statute is ambiguous, "the courts must construe the statute so as to effectuate the legislative intent. In so doing, we avoid a literal reading if it would result in unlikely, absurd or strained consequences." *Whatcom County*, 128 Wn.2d at 546 (citing *State v. Elgin*, 118 Wn.2d 551, 555, 825 P.2d 314 (1992)). We must give effect to legislative intent " 'within the context of the entire statute.' " *Whatcom County*, 128 Wn.2d at 546 (quoting *Elgin*, 118 Wn.2d at 556). Courts interpret statutes so that all the language is given effect and no portion is rendered meaningless or superfluous. *Id.* The right to sue a governmental entity "must be derived from statutory enactment; and it must be conceded that the state can establish the conditions which must be met before that right can be exercised." *Nelson v. Dunkin*, 69 Wn.2d 726, 729, 419 P.2d 984 (1966).

¶27 RCW 64.40.020 provides in pertinent part:

> Owners of a property interest who have filed an application for a permit have an action for damages to obtain relief from *acts* of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority, or relief from a failure to *act* within time limits established by law: PROVIDED, That the action is unlawful or in excess of lawful authority only if the final decision of the agency was made with knowledge of its unlawfulness or that it was in excess of lawful authority, or it should reasonably have been known to have been unlawful or in excess of lawful authority.

RCW 64.40.020(1) (emphasis added). The statute also defines the term "act" as used in the statute:

> "Act" means a final decision by an agency which places requirements, limitations, or conditions upon the use of real property in excess of those allowed by applicable regulations in effect on the date an application for a permit is filed. "Act" also means the failure of an agency to act within time limits established by law in response to a property owner's application for a permit: PROVIDED, That there is no "act" within the

meaning of this section when the owner of a property interest agrees in writing to extensions of time, or to the conditions or limitations imposed upon an application for a permit. "Act" shall not include lawful decisions of an agency which are designed to prevent a condition which would constitute a threat to the health, safety, welfare, or morals of residents in the area.

RCW 64.40.010(6). And, as we noted above, "[a]ny action to assert claims under the provisions of this chapter [64-.40 RCW] shall be commenced only within thirty days after all administrative remedies have been exhausted." RCW 64.40.030.

¶28 Sympathetic though we may be to the Callfases' frustration over four years of delay, we cannot read chapter 64.40 RCW as permitting a general cause of action for arbitrary and capricious administrative delay in processing a permit application. The Callfases' argument that it does has two fatal flaws.

¶29 In order to state a claim under RCW 64.40.020, there must be an "act" of the government agency. That "act" may either be a "final decision" on an application or a "failure . . . to act within time limits established by law" when processing a land use permit application. RCW 64-.40.010(6). When the "final decision" as defined by RCW 64-.40.010(6) is "arbitrary, capricious, unlawful or exceed[s] lawful authority," the applicant has a valid claim under RCW 64.40.020(1). Similarly, when the permitting authority has failed to act on the application within the time a state statute or a local ordinance requires, the applicant has a valid claim under the other prong of that section. But where there is no specific "act" complained of, the legislature has not provided a remedy under chapter 64.40 RCW. The reason for this interpretation is simple: without a specific "act," there is no basis on which to determine when to commence the time limit with which RCW 64.04.030 requires a plaintiff to comply. Were we to agree with the Callfases that there is a general "continuing violation" claim under chapter 64.40 RCW that is exempt from RCW 64.40.030, we would be writing that section out of the statute for an entire class of claims. That we cannot do.

¶30 Without a final decision, or a "failure to act" within specified legal time limits, there would be no date on which the limitations period is triggered.[6] Claimants could file suit at any time during a long delay, including before there was a final decision. Because every lawsuit filed under chapter 64.40 RCW is unambiguously subject to the limitations period in RCW 64.40.030, the legislature did not provide for a general claim that could be brought at any time during the permit process.

¶31 *Mission Springs, Inc. v. City of Spokane*, 134 Wn.2d 947, 954 P.2d 250 (1998), a case the Callfases rely heavily on, is not to the contrary. There, the City issued a permit for a planned unit development (PUD) on August 31, 1992. After his original grading permit expired, the developer filed an identical grading permit application in October 1994. *Mission Springs*, 134 Wn.2d at 952-53. At a city council meeting on June 22, 1995, Spokane's building official said that he was ready to issue the permit, but the City Council voted to deliberately delay it. The city manager then refused to process the permit application and, on July 3, 1995, the developer filed a suit for damages and an injunction under chapter 64.40 RCW and 42 U.S.C. § 1983. *Mission Springs*, 134 Wn.2d at 954-57.

¶32 The Supreme Court first noted that the PUD approval vested the developer with a right to build out to the approved permit specifications within five years. *Mission Springs*, 134 Wn.2d at 958 and n.12 (citing RCW 58-.17.033). Delaying or refusing to issue a permit to which a person is lawfully entitled violates the applicant's statutory and constitutional rights if he either has a vested right to the permit or has satisfied all relevant statutory and ordinance criteria and is thus entitled to it. *Id.* at 959-60. It is true, as the Callfases and Amicus point out, that the Supreme Court in *Mission Springs* recognized that the applicant had a cause of action under RCW 64.40.020 because Spokane "arbitrarily refused to process Mission

---

[6] The Callfases do not assert that the City missed any of the statutorily-mandated processing deadlines.

Springs' grading permit application and unlawfully withheld the permit as well." 134 Wn.2d at 962. Amicus and the Callfases also properly characterize language in *Mission Springs* as recognizing a claim for delay damages. But there is a critical difference between this case and *Mission Springs*: The Spokane developer filed his action under chapter 64.40 RCW well within 30 days of the City's "act" of voting to delay the permit to which he was entitled. 134 Wn.2d 954, 957. The Supreme Court therefore did not need to examine whether or not the statute of limitations in RCW 64.40.030 applied to continuing delays by an agency in processing or approving a permit. *Mission Springs*, 134 Wn.2d at 961-62. Thus, while *Mission Springs* does recognize a claim for delay damages, nothing in the case excuses the claimant from bringing the claim within 30 days of and in conjunction with an "act" as defined by RCW 64.40.010(6).

¶33 *City of Seattle v. Blume*, 134 Wn.2d 243, 947 P.2d 223 (1997), which the parties and Amici all cite, is not really relevant to the issue here. *Blume* was also an administrative delay case involving an MUP application that was still not approved more than five years after the Blumes filed their application. They eventually withdrew the application and sued under chapter 64.40 RCW and for intentional interference with a business expectancy. *Blume*, 134 Wn.2d at 249. The Court of Appeals affirmed the trial court's ruling that the Blume's chapter 64.40 RCW claim was barred by the 30-day statute of limitations and, on reconsideration, ruled that the intentional interference claim was barred by the independent judgment rule articulated in *King v. City of Seattle*, 84 Wn.2d 239, 525 P.2d 228 (1974). The Supreme Court used the Blume's appeal as "the opportunity to analyze the wisdom and efficacy of" the independent business judgment rule and to abrogate it in favor of "traditional principles of proximate causation." *Blume*, 134 Wn.2d at 252, 260. In doing so, the court held that the Blume's tortious interference claim was governed by the three-year tort statute of limitations, RCW 4.16.080(2).

*Blume*, 134 Wn.2d at 250-51. Under that statute, their suit was timely. Because the Supreme Court in *Blume* did not address chapter 64.40 RCW, it does not provide any guidance to our resolution of the issue here.[7]

¶34 *Smoke v. City of Seattle*, 132 Wn.2d 214, 937 P.2d 186 (1997), is also inapposite. It held that a city attorney's letter opinion on an issue that determined the applicant's rights to a MUP was a final decision from which there was no administrative appeal to exhaust. 132 Wn.2d at 222-27. Because Smoke filed suit under chapter 64.40 RCW within 30 days of the City's letter, the lawsuit was timely. Again, the court did not discuss whether a "continuing delay" was actionable under chapter 64.40 RCW, so the decision does not help us here.

¶35 The Callfases make an interesting argument, by analogy to medical malpractice and employment discrimination cases, that there should be a "continuing violation" exception to the statute of limitations found in RCW 64-.40.030. In medical malpractice claims, a plaintiff is usually able to claim damages only for negligent actions occurring during the three years before the suit is filed. Under the "continuing course of treatment" theory, a claimant may also plead negligent action that occurred before the last three years if the conduct was part of a "continuing course of treatment" by the defendant. *Caughell v. Group Health Coop. of Puget Sound*, 124 Wn.2d 217, 232, 876 P.2d 898 (1994). But even under the "continuing course of treatment" exception, a medical malpractice plaintiff must still file a suit within three years of the last claimed negligent act. *Caughell*, 124 Wn.2d at 226-30 (citing former RCW 4.16.350 (1998)). Similarly, a plaintiff in an employment discrimination suit may allege a "continuing violation" exception to the three-year statute of limitations for a pattern of ongoing discriminatory conduct. But there, too, at least one final discriminatory act must occur within

---

[7] Like the Blumes, if the Callfases can state a claim for intentional interference with a business expectancy, that cause of action would not be barred by the statute of limitations.

three years before he or she files the suit. The discrimination plaintiff must also show he or she was not aware that the other acts, which would otherwise now be untimely, were discriminatory when they occurred. *Washington v. Boeing Co.*, 105 Wn. App. 1, 6-9, 19 P.3d 1041 (2000) (citing RCW 4.16.080(2)).

¶36 Neither of these common law exceptions to statutes of limitation actually ignores the limitation period because each requires a final act within that three-year time limit. Similarly, under chapter 64.40 RCW damages may, as they did here, result from a series of administrative actions, but the claim for those damages must still be filed within 30 days of a final "act," or a "failure to act within time limits established by law." Chapter 64.40 RCW, like the continuing violations cases discussed above, does allow a claim for damages from a course of conduct, but there still must be an "act" which occurs within the statute of limitations.

¶37 In sum, all of the cases relied upon by the Callfases to support their argument that a claim for continuing delay in the permitting process avoids the statute of limitations are not persuasive. The statute, by its own terms applies to "[a]ny action" under chapter 64.40 RCW. RCW 64.40.030. Thus, while delay in processing or granting a permit may be actionable under chapter 64.40 RCW as an "arbitrary and capricious," final decision, or an "arbitrary and capricious" failure to act within the time limits established by law, claims for damages under chapter 64.40 RCW must still comply with the statute's time requirements for filing. RCW 64.40.010(6), .020, and .030. No cases suggest otherwise.

¶38 The Callfases argue that to interpret chapter 64.40 RCW as not allowing a claim for "continuing violations" would leave plaintiffs with no remedy at all when the City refuses to act on permit applications. That is not entirely correct. Among other possible remedies are the Writ of Mandamus, RCW 7.16.160, to compel a decision on the MUP application, *Norco Constr. Co. v. King County*, 97 Wn.2d 680, 682, 649 P.2d 103 (1982), and a constitutional writ of certiorari, *see Williams v. Seattle Sch. Dist. No. 1*, 97

Wn.2d 215, 221-22, 643 P.2d 426 (1982), to remedy arbitrary and capricious governmental action. Because claims under chapter 64.40 RCW are limited to damages, they do not operate to compel a governmental agency to act. If an applicant succeeds in a mandamus action or constitutional writ, chapter 64.40 RCW provides a damages remedy. *See* *Hayes v. City of Seattle*, 131 Wn.2d 706, 715-16, 934 P.2d 1179, 943 P.2d 265 (1997). Indeed, a permit applicant like the Callfases would have a claim under chapter 64.40 RCW for delay damages, as we noted above, without a writ once the tardy permit was issued. RCW 64.40.020.

¶39 Amici argue that we can reverse the trial court on the ground that the City failed to act within applicable "time limits established by law" in processing the MUP application. RCW 64.40.020. But the Callfases did not make that argument to the trial court and do not make it here. In fact, they state in their reply brief in this court that "Seattle's actions were apparently within the time limits set by Seattle ordinance . . . ." Reply Br. at 4-5. The issue is therefore not properly before us, and we cannot decide it. RAP 2.5(a). Even if we could consider this issue, because it was not raised in the trial court there is no record on which to resolve the factual question it poses. Given the tortured history of the Callfases' MUP application, it is impossible to discern from the record on appeal what time limits, if any, the City met in processing this permit application.[8]

¶40 Finally, Amici contend the suit was timely because the City took final action while it was pending. That is, they filed suit on March 6, 2003, and 85 days later, on May 29, 2003, the City issued the MUP. Relying on *Hayes*, 131 Wn.2d 706, they argue that "issuing or denying the permit

---

[8] *See, e.g.*, Seattle Municipal Code (SMC) 23.76.010 which (1) deems an application complete if the director of the DCLU has not otherwise notified the applicant within 28 days and (2) requires DCLU to notify the applicant within 14 days of receipt of additional information whether the application is now complete; SMC 23.76.005(A) imposing a 180-day deadline for the final decision on a MUP application. (That section now requires that land use decisions be made within 120 days. SMC 23.76.005(A) (2002)).

is the final administrative action" under RCW 64.40.030, and the limitations period did not begin to run until that time.

¶41 *Hayes* involved two actions in Superior Court arising from City Council action limiting the size of Hayes' proposed building. After the Council acted, Hayes filed a writ of certiorari under RCW 7.16.030, and the Superior Court ordered the Council on remand to identify any adverse impacts the size reduction was designed to mitigate.[9] 131 Wn.2d at 709-10. The Council again acted, this time to approve the building at its original bulk and size. Within 30 days of that decision, Hayes filed an action for delay damages under RCW 64.40.020 and 42 U.S.C. § 1983. *Id.* After concluding that res judicata did not bar the second action, the Supreme Court held that, because Hayes filed a timely writ to overturn the Council's initial decision, he had not exhausted his administrative remedies for purposes of RCW 64.40.030 because "final action on Hayes's request for a permit did not occur until the City Council ultimately approved his application for a master use permit." 131 Wn.2d at 716. The crucial difference between our case and *Hayes* is that the Callfases filed their action *before* the MUP was issued, unlike Hayes who filed his damages action within 30 days *after* he had exhausted his remedies, i.e., *after* the permit was issued. Because RCW 64.40.030 limits actions under that chapter to those "commenced only within thirty days *after* all administrative remedies have been exhausted," an action for damages for arbitrary and capricious action in denying or granting a permit, including the attendant delay, is not ripe until the City has in fact acted. *See Macri v. King County*, 126 F.3d 1125, 1130 (9th Cir. 1997) (emphasis added).

¶42 Because the City is the prevailing party in this action, we grant its request for attorney fees pursuant to RCW 64-.40.020(2) in an amount to be set by a commissioner of this court upon the City's timely application. The commissioner *will determine the reasonableness of the rate, any duplica-tive effort and award fees based on the lodestar method.*

---

[9] The Writ of Certiorari procedure has now been replaced by a Land Use Petition Act petition under chapter 36.70C RCW.

¶43 The trial court decision is affirmed.

AGID and SCHINDLER, JJ., concur.

Motions for reconsideration granted and opinion amended November 22, 2005 and January 19, 2006.

Reconsideration denied May 31, 2006.