[No. 21698-8-I. Division One. April 10, 1989.]

JAMES FAVORS, ET AL, *Respondents,* v. NORMAN MATZKE,
ET AL, *Defendants,* THE STATE OF WASHINGTON,
ET AL, *Appellants.*

Kenneth O. Eikenberry, Attorney General, and Andrew G. Cooley, Assistant, for appellants.

Richard B. Sanders, for respondents.

SCHUMACHER, J.*—A jury verdict and judgment were entered against the State of Washington and Clifford Johnston for damages resulting from an investigation by Johnston of alleged sexual abuse of a foster child. The State and the Johnstons appeal. We reverse.

---

*Judge John W. Schumacher is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

## FACTS

James and Doris Favors operated a foster home under a license issued to them by the Department of Social and Health Services (DSHS). One of the foster children in their care was Mary Jane, who was 20 years old and mentally retarded.

Mary Jane attended a school for developmentally delayed persons. On December 6, 1983, Mary Jane reported to her teacher and again to the principal that James Favors had committed certain acts upon her, which acts would constitute sexual abuse. Believing her, the school principal telephoned Doris Favors, informing her that the accusation had been made and that public authorities would be notified. The principal also notified the Child Protective Services (CPS) division of DSHS.

Clifford Johnston, a CPS investigator, was assigned to the case. Johnston had 10 years' experience and special training in child abuse cases. His first step was to review a report prepared by Mary Jane's teacher and interview her principal. He then questioned Mary Jane and found her responses to be consistent with what she had earlier reported at school. On the basis of this investigation, Johnston reported to his supervisors his belief that sexual abuse had occurred.

Johnston testified that in the normal case, where, after initial investigation there was reason to believe abuse had occurred, the offender would be requested to leave the foster home pending completion of the investigation. If the suspected offender refused to leave, the foster children would be removed to avoid harm.

However, the Favorses' facility cared for an unusually large number of handicapped people, and DSHS administrators hoped not to have the problem of finding new homes for each of them. For this reason, Johnston was directed to take no further action until CPS, Children's Welfare Services, the administrators in charge of licensing foster care, and other public and private agencies had met and conferred. Johnston was not involved in such meetings.

As a result of the meetings, DSHS administrators instructed Johnston to present three options to the Favorses. The first was for James Favors to move out of the foster home for the time being. The second was for James Favors to undergo and pass a polygraph test, in which case he could remain at the home. The third option, in the event the Favorses refused the first two, would be the removal of the children to other facilities by DSHS.

On December 15, Johnston went to the Favorses' foster home, where he spoke to them for the first time. In the course of an hour–long visit, Johnston fully discussed Mary Jane's allegations with Mrs. Favors, talked briefly with Mr. Favors who had telephoned from another location, and presented the three options. Mrs. Favors rejected the first option, stating that Mr. Favors would not leave the house. Mr. Favors initially refused the polygraph examination, but after consulting his wife, finally agreed to take it.

Later at trial, Mrs. Favors testified that Johnston told her husband that if he did not agree to take a polygraph test, Johnston and the State would take all of the children from the home, place Mr. Favors' name on a central registry as a child abuser, and revoke their foster care license.

Johnston testified, and noted in his record of the meeting, that he informed the Favorses there was a "need to get matters straightened out" and the "State's only choice was revocation of [the] license and removal of [the] children" if the problem could not be favorably resolved by the polygraph. He said he also told Mrs. Favors the only way DSHS could justify leaving the children was if DSHS had supporting empirical information, such as a polygraph result indicating Mr. Favors had not abused the child.

Johnston referred the Favorses to Norman Matzke, a polygraph examiner. In the process, Johnston did not request Favors' consent for him to see the test results, although he had a form available to him for that purpose. He provided the Favorses with no written or oral information about the test and did not specifically advise James Favors that he had a right to refuse the test. Johnston did

not tell the Favorses that the test results would be communicated directly to him and not to them. He did not say that the test results could or would be referred to the police department or advise of any possibility of their being used in a criminal prosecution. Nor did Johnston tell them that the results would be used to justify the revocation of their foster care license and the placement of Mr. Favors' name on a registry of child abusers.

On December 20, James Favors underwent and failed a polygraph test. After the test was finished, the examiner informed Johnston of the result and immediately all DSHS foster children were removed from the Favorses' home. James Favors' name was place on the central registry of child abusers and DSHS notified the Favorses of its intent to revoke their foster care license.

The Favorses requested a fair hearing on the licensing and central registry actions, and a hearing was conducted in May 1984. A hearing examiner found that the allegations had not been proven and held against DSHS. The State appealed to the Director, who affirmed the hearing examiner's decision. Nevertheless, DSHS never again placed children in the care of the Favorses and never returned those who had been removed.

The Favorses later filed a lawsuit against the State of Washington, Clifford Johnston, King County and Norman Matzke, alleging a variety of claims. Following a trial in November 1987, the trial court submitted five claims against the State of Washington and Clifford Johnston to the jury: violation of civil rights, invasion of privacy, breach of contract, violation of the Consumer Protection Act, and failure to disclose material facts/misrepresentation. The jury awarded the Favorses damages of $73,000 for failure to disclose material facts/misrepresentation and held in favor of the State and Johnston on the remaining claims. (The jury also assessed damages against Matzke which are not the subject of this appeal.)

This appeal followed.

## Issues

The issues raised by this appeal are as follows: (1) Should the State's appeal be dismissed because of its failure to provide an adequate record on appeal? (2) Should the trial court have given instruction 18 on the theory of misrepresentation by failure to disclose material facts to the jury? (3) Did the State adequately except to instruction 18? (4) Did the trial court err in admitting evidence of foster care payments to the Favorses in proof of their damages?

## Adequacy of Appeal Record

The Favorses contend that this appeal should be dismissed for lack of a complete trial record. The State responds that the record is complete, that every effort was made to obtain a complete record, and that it is unaware of any evidence admitted at trial not in the record.

RAP 9.2 requires the party seeking review to provide an appeal record containing all evidence necessary and relevant to the issues to be reviewed. The responding party, if dissatisfied, may obtain additional parts of the trial record and request that appellant be ordered to pay for same.

■ The Favorses argue that some testimony, admitted during trial, is missing from the verbatim report of proceedings. However, they are unable to apprise the court of the significance of such missing testimony in relation to the issues on appeal nor have they obtained the additional record as provided by RAP 9.2.

We believe the record submitted contains all evidence necessary for a consideration of the issues raised and that respondents have failed to demonstrate any prejudice from an incomplete record.

## Propriety of Instruction 18

The claim of failure to disclose/misrepresentation is based upon the theory that Johnston should have told the Favorses what disposition would be made of adverse test results, what consequences would follow a failure to pass the test, and that James Favors was not legally required to

undergo the test. To define the Favorses' burden of proof, the trial court drafted instruction 18 which reads:

. As to plaintiffs' third claim for failure to disclose material facts, plaintiffs have the burden of proving each of the following propositions:

a. That such a relationship of trust and confidence existed between plaintiffs and defendant and that plaintiffs were induced to relax the care and vigil[a]nce they would normally exercise for their own protection;

b. That the plaintiffs were justified in expecting their interests would be cared for by the defendant;

c. That the defendant failed to disclose to plaintiffs certain material facts of which the plaintiffs were unaware;

d. That plaintiffs sustained damages;

e. That the defendant's failure to disclose material facts proximately cause plaintiffs' damages.

If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for the plaintiff. On the other hand, if any of these propositions has not been proved, your verdict should be for the defendant.

In drafting this instruction, the court seems to have relied in part upon the Restatement (Second) of Torts which provides in part:

One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them;

Restatement (Second) of Torts § 551(2)(a) (1977); and in part upon the Restatement of Contracts definition of a fiduciary relationship as one in which one party

occupies such a relation to the other party as to justify the latter in expecting that his interests will be cared for . . .

Restatement of Contracts § 472(1)(c) (1932).

The impact of instruction 18, therefore, was to submit to the jury the question of whether Johnston occupied such a relationship of trust and confidence with the Favorses that

he had a duty to disclose to them any material information in his knowledge pertaining to the polygraph test before it was administered.

We conclude it was error to give instruction 18 for the reason that there was no duty on the part of Johnston to disclose under the circumstances of this case.

■ Washington law follows the Restatement rule and imposes liability when one fails to reveal material facts within one's knowledge when there is a duty to speak, the failure to disclose being, in effect, a representation of the nonexistence of a fact which is not disclosed. *Oates v. Taylor,* 31 Wn.2d 898, 199 P.2d 924 (1948); *Boonstra v. Stevens–Norton, Inc.,* 64 Wn.2d 621, 393 P.2d 287 (1964).

In Washington, the court will find a duty to disclose where the court can conclude there is a quasi–fiduciary relationship, *Boonstra v. Stevens–Norton, Inc., supra,* where a special relationship of trust and confidence has been developed between the parties, *Salter v. Heiser,* 36 Wn.2d 536, 219 P.2d 574 (1950), where one party is relying upon the superior specialized knowledge and experience of the other, *Hutson v. Wenatchee Fed. Sav. & Loan Ass'n,* 22 Wn. App. 91, 588 P.2d 1192 (1978), where a seller has knowledge of a material fact not easily discoverable by the buyer, *Sorrell v. Young,* 6 Wn. App. 220, 491 P.2d 1312 (1971), and where there exists a statutory duty to disclose, *Kaas v. Privette,* 12 Wn. App. 142, 529 P.2d 23 (1974) (*see also Clausing v. DeHart,* 83 Wn.2d 70, 515 P.2d 982 (1973)). On the other hand, the rule has always been that silence as to material facts is not fraud where there is no duty to disclose. *Kaas v. Privette, supra* at 147.

The existence of a duty is a question of law. *Taylor v. Stevens Cy.,* 111 Wn.2d 159, 168, 759 P.2d 447 (1988); *Pedroza v. Bryant,* 101 Wn.2d 226, 677 P.2d 166 (1984); *Peterson v. Pacific First Fed. Sav. & Loan Ass'n,* 23 Wn. App. 688, 598 P.2d 407 (1979). Once the determination is made that a legal duty exists, the jury's function is to decide whether the facts come within the scope of such

duty. *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 653 P.2d 280 (1982).

Johnston's duties as a CPS caseworker are spelled out by RCW 74.13.031:

The department shall have the duty to provide child welfare services as defined in RCW 74.13.020, and shall:

. . .

(3) Investigate complaints of neglect, abuse, or abandonment of children, and on the basis of the findings of such investigation, offer child welfare services in relation to the problem to such parents, legal custodians, or persons serving in loco parentis, and/or bring the situation to the attention of an appropriate court, or another community agency: *Provided,* That an investigation is not required of nonaccidental injuries which are clearly not the result of a lack of care or supervision by the child's parents, legal custodians, or persons serving in loco parentis. If the investigation reveals that a crime may have been committed, the department shall notify the appropriate law enforcement agency.

In addition, RCW 74.15.010 provides, in part:

The purpose of chapter 74.15 RCW and RCW 74.13-.031 is:

(1) To safeguard the well–being of children, expectant mothers and developmentally disabled persons receiving care away from their own homes;

In essence, Johnston's duty was to investigate allegations of child abuse and to protect the child or children involved.

Nor, in absence of the statutory duties, could we find a special relationship between Johnston and the Favorses, justifying the imposition of a duty to disclose. The Favorses knew from the initial telephone call from the school principal that the allegation of child abuse would be reported to public authorities. At his first meeting with the Favorses, Johnston made it clear that his duty was to find out whether the allegation was true. James Favors was informed that his options were to move from the home or undergo a polygraph test and pass, and if he did neither, the children would be removed. At this point, the seriousness of Johnston's investigation was apparent to the

Favorses, as reflected by their mutual concern as to whether James Favors should submit to a polygraph test. It further had to be obvious to the Favorses that their relationship with DSHS as a foster home was in jeopardy. Under these circumstances, we find that no special relationship had been developed giving rise to a quasi–fiduciary or other duty on the part of Johnston to inform James Favors of the potential consequences of failing the polygraph.

### EXCEPTION TO INSTRUCTION 18

The Favorses contend that instruction 18 became the law of the case because the State, at the trial, excepted to the instruction only in general terms, providing no specific grounds for the exception and identifying no specific portions of the instruction as being erroneous, per CR 51(f).

While it is true that a general exception to a proposed jury instruction is usually insufficient because it does not adequately apprise the trial court of the error it is about to make, CR 51(f), *Stuart v. Consolidated Foods Corp.*, 6 Wn. App. 841, 496 P.2d 527, *review denied*, 81 Wn.2d 1002 (1972), the underlying purpose of the requirement of a specific exception is to assure that the trial court be informed of the exact points of law and precise reasons why counsel believes the court will commit error. *Stewart v. State*, 92 Wn.2d 285, 597 P.2d 101 (1979).

In this instance, there is no question but what the trial court was aware of the points of law and precise grounds of the State's exception. The giving of instruction 18 was a significant issue throughout the trial. The trial judge spent considerable time and effort in drafting the instruction, conferring with counsel from time to time, and expressing concerns about different specific aspects of the instruction. In addition, the trial judge stated on record that the State's objection to the entire instruction was sufficient. We believe that the fundamental purpose of CR 51(f) has been adequately served in this instance and that the State's general exception to instruction 18 was sufficient.

Because of the disposition of this appeal, we need not address the State's challenge regarding the burden of proof nor its contention that evidence of payments to the Favorses for foster care was improperly admitted to support their claim of lost earnings.

The trial court's judgment is reversed and the action dismissed.

SWANSON and WINSOR, JJ., concur.

Reconsideration denied August 29, 1989.

Review denied at 113 Wn.2d 1033 (1989).