[No. 43081-5-I.   Division One.   December 20, 1999.]
PATTI PETTIS, *Appellant*, v. THE STATE OF WASHINGTON, ET AL., *Respondents*.

---

*Thomas G. Burke*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Robert C. Hargreaves, Assistant*, for respondents.

COLEMAN, J. — Patti Pettis, a child care director, was investigated for alleged physical child abuse based on a complaint made by one of her staff. The investigator determined that the evidence was inconclusive. Pettis sued the State, the Department of Social and Health Services (DSHS), and Inger Mikkelsen, the investigator, for negli-

gent and intentional infliction of emotional distress. The trial court dismissed her claims on summary judgment. We affirm because no duty of care was owed to Pettis and no evidence exists to support a claim of intentional infliction of emotional distress.

## FACTS

Patti Pettis was the director for the Satellite Childcare Center for Highline School District, which provides child care services and parenting skills to teen parents enrolled as students. The center is a certified child care facility licensed by DSHS. An allegation of child abuse was made against Pettis by a child care worker, Kathy Boulous. The allegation stated that Pettis pinched children, pulled them by their hair, shook them, and told them to "shut up."

Inger Mikkelsen, a Children's Protective Services (CPS) investigator, was assigned to investigate the allegation. It was her responsibility to notify the licensing agent for the center, Marge Sorlie, of her conclusions. Mikkelsen interviewed other workers at the center, as well as students, and most said that they had never seen Pettis engage in inappropriate behavior. Employees did state that Pettis, who wears a hearing aid, talked too loudly, but that her hearing loss may be the cause. One worker reported that she was taught to hold children down in their cots during nap time. A student also reported seeing Pettis both pick up a child by one arm and hit a child.

When Mikkelsen talked with Boulous, Boulous admitted that when she observed Pettis abusing children, she was the only one present. Mikkelsen observed that when she told Boulous that she was the only worker who had witnessed anything inappropriate, she became "very defensive" and went into a "tirade," maintaining that she was not lying.

In addition to workers and students, Mikkelsen also interviewed the school principal and the school nurse. Both stated that they never witnessed any abuse by Pettis and

that it was the nurse's impression that CPS was "trying to prove a 'pattern' existed." A CPS file from a few years before stated that the nurse reported seeing Pettis lift a child from its crib by one arm and that Pettis had been told how harmful that behavior was.

Mikkelsen concluded that while Boulous was less than truthful, there did appear to be a pattern of rough handling of children since 1990 at the center, but that it did not rise to the level of child abuse. Mikkelsen noted that there was no documented physical injury to any child and that the children were too young at the time of the alleged abuse to be successfully interviewed. She reported that her findings were "inconclusive" and recommended that if Pettis were to continue serving as director, she must take classes on child development and behavior.

Sorlie stated that she made an agreement with both Pettis and the principal that Pettis could continue in her position as director provided that she take further child behavior and parenting classes and that the supervision by her principal increase. After Sorlie informed the district of Mikkelsen's conclusions and of the alleged agreement with Pettis, the district decided that, due to her history of difficulties, Pettis would be reassigned to another school where she would not have a supervisory role.

Pettis chose not to accept the transfer and instead filed this lawsuit. She contends that Mikkelsen was negligent in her investigation, which caused Pettis the emotional distress of major depression and generalized anxiety disorder that her doctor believed were likely caused by the investigation of child abuse. Pettis additionally claims that Mikkelsen intentionally inflicted emotional distress upon her.

The trial court dismissed Pettis's claims on summary judgment. It held that DSHS did not owe a duty to Pettis, that Pettis did not establish sufficient harm for either negligent or intentional infliction of emotional distress, that no genuine issue of material fact exists to defeat summary judgment, and that Mikkelsen is entitled to qualified immunity. Although other claims were also dismissed by

the trial court, she appeals only the claims of negligent and intentional infliction of emotional distress. Because we hold that no duty of care was owed to Pettis, we do not reach the issue of qualified immunity.

## DISCUSSION

### Negligent Infliction of Emotional Distress

Pettis presents two arguments to demonstrate that a duty of care was owed to her while she was the subject of a child abuse investigation. She first contends that RCW 26.44, as it existed at the time of the investigation, should be interpreted to provide a duty of care to child care workers being investigated for allegations of child abuse. Alternatively, Pettis argues that the statute's 1997 amendments, which require that certain information be given to all alleged perpetrators, be applied retroactively to the investigation of Pettis.

Appellate review of summary judgment orders is de novo, and all inferences and facts are viewed in the light most favorable to the nonmoving party. *Green v. A.P.C.*, 136 Wn.2d 87, 94, 960 P.2d 912 (1998). Summary judgment is proper if the pleadings, depositions, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985).

### Statute in Effect at Time of Investigation

■ The threshold determination in a claim of negligence is the existence of a duty to the plaintiff, which is a question of law. *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 168, 759 P.2d 447 (1988). In general, a claim for negligent investigation does not exist under the common law of Washington. That rule recognizes the chilling effect such claims would have on investigations. *Corbally v. Kennewick Sch. Dist.*, 94 Wn. App. 736, 740, 973 P.2d 1074 (1999) (citing *Fondren v. Klickitat County*, 79 Wn. App. 850, 862, 905 P.2d 928 (1995) and *Dever v. Fowler*, 63 Wn. App. 35, 45,

816 P.2d 1237 (1991)). An exception to the common law doctrine exists, however, when DSHS investigates child sexual abuse cases involving parents. *See Babcock v. State,* 116 Wn.2d 596, 809 P.2d 143 (1991); *Corbally,* 94 Wn. App. at 740; *Lesley v. Department of Soc. & Health Servs.,* 83 Wn. App. 263, 921 P.2d 1066 (1996).

■ Under RCW 74.15.030(4), the State has the duty to investigate allegations of child abuse involving state agencies, including licensed child day-care centers, in accordance with RCW 26.44. RCW 26.44.010 makes clear that although the Legislature recognizes that the bond between the parent, custodian, or guardian and the child is of great importance, when the child's health and safety are endangered, the State may intervene based upon verified information. The Legislature has specifically included parents, custodians, and guardians of children "within the class of persons who are foreseeably harmed by a negligent investigation into allegations of child abuse[.]" *Tyner v. Department of Soc. & Health Servs.,* 92 Wn. App. 504, 512, 963 P.2d 215 (1998), *review granted,* 137 Wn.2d 1020 (1999).

Pettis contends that the statutory duty to investigate child abuse cases itself imposes a duty of care on the investigator to conduct the investigation without negligence. She relies on the holdings in *Lesley,* 83 Wn. App. at 273 and *Yonker v. Department of Social and Health Services,* 85 Wn. App. 71, 930 P.2d 958 (1997) to support her position. Both decisions recognize that DSHS has a duty to investigate and that the parents may bring a cause of action for negligent investigation.

But the *Lesley* and *Yonker* decisions do not hold that the statutory duty to investigate in itself creates a negligent investigation claim on behalf of the party being investigated. *Corbally,* 94 Wn. App. at 740 (interpreting the *Lesley* holding). *See also Favors v. Matzke,* 53 Wn. App. 789, 794-98, 770 P.2d 686 (1989).[1] The *Lesley* and *Yonker* holdings, both that DSHS has a statutory duty to investigate

---

[1] This court has previously held that the statutory duty to investigate under RCW 74.13.031 does not create a duty to foster care providers. The decision in

child abuse and that a cause of action may arise for negligent investigation, cannot be divorced from their factual contexts. In both cases, it was the parents who brought suit for negligent investigation and the courts held that legislative intent supported such claims. Those two decisions are confined to the parent-child relationship at issue and cannot be imputed into other nonparental contexts.

Pettis asks us to extend the duty that is owed to parents and children to include child care workers. She argues that negative or unresolved allegations of child abuse may prevent a child care worker from obtaining employment within that field. According to Pettis, because of the severe consequences of possible nonemployability, the State owes a duty to those it investigates to conduct its investigation without negligence.

If the duty of care is to be extended to child care workers, the proper body to make that decision is the Legislature. The state Legislature has thus far declined to do so. In RCW 26.44.010, the Legislature specifically recognized the unique relationship between parent and child and made clear that the State may interfere with that relationship in only the most urgent situations. That legislative intent is inconsistent with extending a duty of care to nonparental relationships. In balancing the need to investigate abuse complaints with the protection of the parent-child relationship, the Legislature acknowledged that a unique relationship exists between parents and their children, and it did not include caretakers within that classification. That balance was not ascribed to other relationships. We hold that the statute as it existed at the time of the investigation provided no duty of care to Pettis.

---

*Favors* addressed whether an investigator of state certified foster care providers had a duty to disclose to the alleged abuser the consequences of taking a polygraph test. The investigator did not inform the alleged abuser that he was not required to take the test or that failing the test would be justification to revoke his license. *Favors*, 53 Wn. App. at 792-93. We held that the statutory duty to investigate did not include a duty to disclose, nor did a special relationship exist between the investigator and the Favorses creating such a duty. *Id.* at 797.

### Retroactive Application of the 1997 Amendments

■ A statutory amendment is presumed to have prospective effect "unless it is remedial in nature or unless the Legislature provides for retroactive application." *State v. McClendon*, 131 Wn.2d 853, 861, 935 P.2d 1334 (footnote omitted), *cert. denied*, 522 U.S. 1027 (1997). A remedial statute is one that relates to "practice, procedures and remedies and is applied retroactively when it does not affect a substantive or vested right. 'A "right" is a legal consequence deriving from certain facts, while a remedy is a procedure prescribed by law to enforce a right.' " *Id.* at 861 (quoting *Department of Retirement Sys. v. Kralman*, 73 Wn. App. 25, 33, 867 P.2d 643 (1994)) (footnotes omitted).

■ The 1997 amendments provide that an alleged perpetrator shall receive notice of the allegations against him or her at the earliest point in the investigation that does not jeopardize the child's safety. RCW 26.44.100(2). They also require that the department notify the alleged perpetrator (1) of the report at the end of the investigation, (2) that he or she may respond to the report in writing, and (3) that certain information may be used in future investigations and determinations. RCW 26.44.100(2).

The amendments are not remedial. They are not procedures to enforce a right—they are rights themselves. At the time of Mikkelsen's investigation, Pettis had no statutory right to receive notification and information; that right was statutorily provided by the 1997 amendments. The amendments are not clarifying or remedying the enforcement of an existing right because that right did not exist prior to the amendments.

■ Furthermore, the presumption of prospective application is strengthened by the language of the statute on its face. When statutory language is in the present or future tenses, the statute is interpreted to apply only prospectively. *Anderson v. Pierce County*, 86 Wn. App. 290, 310, 936 P.2d 432 (1997). The amendments provide that the department shall notify the alleged perpetrator of the allegations "at

the earliest possible point in the investigation . . . ." and that "[w]henever the department completes an investigation . . . ." it shall notify the alleged perpetrator of its findings. RCW 26.44.100(2). The words "earliest" and "whenever" suggest future application.

Pettis fails to demonstrate that the Legislature intended retroactive application of the amendments. Accordingly, we hold that the amendments are prospective only and that they do not retroactively provide a right to Pettis at the time she was investigated.

■ Moreover, even if the amendments were retrospectively applied to Pettis's investigation, we are not persuaded that they would support an action for negligent investigation. The amendments merely provide that certain information be given to an alleged perpetrator, including the nature of the allegations and the fact that an investigation is in progress. RCW 26.44.100(2). But the beginning of that subsection, emphasizing the legislative concern regarding parental relations, remains the same.

> The legislature reaffirms that all citizens, including parents, shall be afforded due process, that protection of children remains the priority of the legislature, and that *this protection includes protecting the family unit from unnecessary disruption. To facilitate this goal, the legislature wishes to ensure that parents and children be advised in writing . . . of their basic rights[.]*

RCW 26.44.100(1) (emphasis added). Thus, reading both subparts together, we do not see how the notification requirements could support a nonparental cause of action for negligent investigation.

Public Duty Doctrine

■ Pettis lastly argues that the public duty doctrine cannot shield DSHS from liability in negligence. The public duty doctrine allows individuals who are not part of a protected class to bring suit against a public official only when a special relationship was established between that individual and the official. *Taylor v. Stevens County*, 111

Wn.2d 159, 164, 759 P.2d 447 (1988). To establish a special relationship, Pettis must show that (1) direct contact or privity between the public official and her sets her apart from the general public, (2) express assurances were given to her by a public official, and (3) the assurances justify her reliance. *Keates v. City of Vancouver,* 73 Wn. App. 257, 269-70, 869 P.2d 88 (1994) (citing *Honcoop v. State,* 111 Wn.2d 182, 192, 759 P.2d 1188 (1988)). None of these criteria are satisfied. In particular, there is no evidence that any assurances were given to her by DSHS or Mikkelsen that justified an expectation of a duty of care to Pettis.

Intentional Infliction of Emotional Distress

██ ██ The intentional infliction of emotional distress, also known as outrage, requires (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual resulting severe emotional distress. *Rice v. Janovich,* 109 Wn.2d 48, 61, 742 P.2d 1230 (1987). The acts must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Dicomes v. State,* 113 Wn.2d 612, 630, 782 P.2d 1002 (1989) (quoting *Grimsby v. Samson,* 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (emphasis omitted)). The emotional distress cannot merely be embarrassment or humiliation. *Dicomes,* 113 Wn.2d at 630.

██ Although we have held that "a case of outrage should ordinarily go to a jury so long as the court determines the plaintiff's alleged damages are more than 'mere annoyance, inconvenience, or normal embarrassment' that is an ordinary fact of life," *Brower v. Ackerley,* 88 Wn. App. 87, 101-02 n.41, 943 P.2d 1141 (1997), the court determines whether reasonable minds could differ on whether the conduct is sufficiently extreme to result in liability. *Chambers-Castanes v. King County,* 100 Wn.2d 275, 289, 669 P.2d 451, 39 A.L.R.4TH 671 (1983). The factors that a court considers are (1) the position of the defendant, (2) whether the defendant knew the plaintiff was particularly susceptible to emotional distress and consciously proceeded

anyway, (3) whether the defendant's conduct was privileged, and (4) the severity of the emotional distress. *Keates*, 73 Wn. App. at 264.

Pettis contends that her emotional distress is proof of her claim of outrage and argues that the first two elements must be tried to a jury as a matter of law. Pettis is incorrect. The trial court must initially decide that the conduct could reasonably be regarded as extreme and outrageous to then warrant a factual determination by a jury. *Jackson v. Peoples Fed. Credit Union*, 25 Wn. App. 81, 84, 604 P.2d 1025 (1979).

To support her claim, Pettis relies on conclusory allegations rather than on specific evidence. The acts that Pettis contends constitute outrageous conduct are the ignoring of a presumption of innocence, the reliance on unsubstantiated allegations, the failure to disclose the nature of the allegations to her, and the reliance solely on her loud voice and lack of good relations with students and staff in sanctioning her.

The conduct that Pettis alleges to be "outrageous" simply does not rise to the level of atrocity or intolerability in civilized society to justify a cause of outrage. Based upon the record before us, reasonable minds could not find that Mikkelsen's actions constituted extreme or outrageous conduct. There is no evidence that Mikkelsen or the State intentionally harassed Pettis. The record as a whole shows that Mikkelsen recorded and considered unfavorable accounts of Pettis as well as favorable. Her finding of "inconclusive" demonstrates that the alleged unsubstantiated allegations were not given complete credence to the exclusion of evidence favorable to Pettis. Moreover, Mikkelsen's recommendation was not based solely on Pettis's personality traits; she acknowledged in her investigation summary that although the specific allegations could not be corroborated, a pattern of rough handling had surrounded Pettis since 1990. Pettis has not met her burden to demonstrate that Mikkelsen's conduct could be found to be outrageous or extreme.

Because the State owed no duty of care to Pettis and did not exhibit extreme or outrageous conduct, we affirm the dismissal of her claims.

Cox and ELLINGTON, JJ., concur.