[No. 57958-4-I. Division One. September 4, 2007.]

WESTMARK DEVELOPMENT CORPORATION ET AL., *Respondents,* v. THE CITY OF BURIEN, *Appellant.*

542

*Charles K. Wiggins* (of *Wiggins & Masters, PLLC*) and *Stephen P. Ryder* (of *Kingman, Peabody, Fitzharris & Ringer, PS*), for appellant.

*John M. Groen* (of *Groen Stephens & Klinge, LLP*) and *Jon P. Ferguson* (of *Jon P. Ferguson Law Group, PLLC*), for respondents.

¶1 COLEMAN, J. — This case concerns the City of Burien's delay in issuing a SEPA[1] decision on a permit application and its misrepresentation that a settlement agreement was approved in an open public meeting. The jury was asked to decide claims of negligence, tortious interference with a business expectancy, and negligent misrepresentation. On a general verdict form, the jury awarded the plaintiff, Westmark Development Corporation, $10,710,000. We affirm for the reasons stated below.

## FACTS

¶2 In 1990, Westmark Development Corporation filed an application with King County for a permit to construct a

---

[1] State Environmental Policy Act, chapter 43.21C RCW.

216-unit apartment building to be known as "Emerald Pointe on the Sound." It was to be built in what would later become the City of Burien. Pursuant to SEPA, King County made a threshold determination of probable significant environmental impacts of the project and issued a determination of significance (DS). The issuance of a DS meant that an environmental impact statement (EIS) would need to be prepared for the project.

¶3 Westmark decided to modify the project to reduce possible environmental impacts. In January 1992, King County sent a letter to Westmark outlining what would need to be done to mitigate the environmental impacts. In May 1992, Westmark submitted a new environmental checklist, revised site plans, civil drawings, a landscape plan, a wildlife report, a traffic study, and a complete resubmittal of building plans and structural drawings. Westmark's revised project eliminated two buildings from the plan and reduced the number of apartments from 216 to 176. In June 1992, King County sent a letter to Westmark stating, "The SEPA Section will review revised plans for the above-referenced permit application in accordance with the State Environmental Policy Act (SEPA, RCW 43.21C), the SEPA Rules (Washington Administrative Code Chapter 197-11), and the County Environmental Procedures (King County Code Chapter 20.44)." Ex. 50.

¶4 Burien officially incorporated on February 28, 1993. Under an interlocal agreement, King County would continue processing permit applications filed with the county before Burien's incorporation. On April 5, 1993, however, Burien assumed responsibility for the Emerald Pointe project, along with a few other projects, under an amendment to the interlocal agreement. Testimony at trial established that Westmark believed King County was close to issuing a decision on its revised application around the time the project was transferred to Burien.

¶5 Burien did not issue a decision on Westmark's revised application until August 17, 1996, when it issued a DS.[2] On June 24, 1996, before Burien issued the DS, Westmark filed this lawsuit alleging negligence and intentional interference with a business expectancy (Westmark I). When a trial was eventually held, the parties disputed why Burien took over three years to issue a decision on the revised application. Westmark argued that Burien intentionally delayed making a decision because it was opposed to the development of apartments and was influenced by Burien resident and then-state-representative Georgette Valle. Burien argued that the delay was due to Westmark's failure to pay fees and submit requested documents. It also argued to the trial court that it was not obligated to issue a new decision on the revised project. Some of the evidence the parties presented will be discussed below.

¶6 Westmark I did not proceed to trial, however, until 2005. It was close to trial in February 1998. Shortly before trial, though, the parties believed they had reached a settlement, based on an exchange of letters and phone calls. The Westmark I trial date was stricken and depositions were cancelled. The settlement fell apart, however, and Westmark sued Burien, arguing that it had breached the settlement agreement (Westmark II). Burien argued that there was no valid settlement agreement because the " 'letters manifested the intent of the parties that their legal obligations would be deferred until a final "Settlement Agreement" was drafted, agreed upon, approved and executed by the proper authorities.' " *City of Burien v. Westmark Dev. Corp.*, noted at 103 Wn. App. 1037, 2000 Wash. App. LEXIS 2433, at *16. The trial court in Westmark II ruled on summary judgment that the letters exchanged constituted a settlement and that Burien had breached the agreement. The Court of Appeals affirmed "the trial court's decision granting summary judgment in Westmark's favor as to the existence and enforceability of a

---

[2] Westmark appealed the DS, but the parties asked the hearing officer to place his decision on hold pending settlement negotiations.

settlement agreement with the City of Burien, but vacate[d] on the issue of breach." *Westmark,* 2000 Wash. App. LEXIS 2433, at *28.

¶7 On remand from the Court of Appeals, the parties attempted to implement the settlement agreement but were not successful. As part of their attempt to implement the agreement, Westmark I was dismissed. The parties never agreed on final settlement agreement terms, and Westmark II was set for trial in January 2004. A few months before trial and over five years after the settlement agreement was reached, Burien advised Westmark that the agreement might be void because it violated the Open Public Meetings Act of 1971 (OPMA), chapter 42.30 RCW. Under the OPMA, a city council can approve of a settlement agreement only in an open public meeting. The settlement agreement between Burien and Westmark had never been approved by the Burien City Council in an open public meeting. Westmark requested that the court determine the validity of the settlement agreement under the OPMA. Noting that the Court of Appeals did not address this issue, the trial court voided the settlement agreement. It concluded that this resolved all claims for relief in Westmark II and dismissed the case with prejudice. It also vacated the prior dismissal of Westmark I and permitted Westmark to file and serve an amended complaint.

¶8 Westmark's amended complaint alleged violation of 42 U.S.C. § 1983, negligence, violation of chapter 43.21C RCW, negligent misrepresentation, and intentional or negligent interference with business relations or expectancies. Westmark named Burien, its attorney Mike Kenyon, and several city employees as defendants. The case was removed to federal court, which remanded the four state law claims but retained jurisdiction over the § 1983 claims. The federal court stayed further proceedings pending resolution of the state law claims.

¶9 The case proceeded in state court solely against Burien because the 42 U.S.C. § 1983 claims were the only claims that ran against the individual defendants. The

trial court dismissed the chapter 43.21C RCW claim because "administrative review was not sought or has not been completed" as to this claim. The trial began on October 6, 2005. After the trial began, the hearing examiner issued his formal decision upholding Burien's 1996 DS. The court refused to admit this decision and instructed the jury that "[t]he issue of what type of SEPA threshold determination should issue is not before you."

¶10 In jury instruction 5, the court summarized Westmark's three claims:

(1) The plaintiff Westmark Development Corporation claims that the defendant City of Burien was negligent by unreasonably delaying a threshold determination regarding Westmark's Revised application for a permit to build a 176-unit project.

(2) The plaintiff Westmark also claims that the defendant Burien intentionally interfered with plaintiff's business expectancies by the various acts and omissions described above and below that were motivated by Burien's improper motive to stop all construction of multi-family housing and that were intended to or had the effect of delaying and/or preventing construction of the project.

(3) The plaintiff Westmark also claims that the defendant Burien made negligent misrepresentations to Westmark by providing false, incomplete, and/or misleading information to Westmark regarding the validity of the settlement between the parties in 1998.

At Burien's request, the jury was given a general verdict form. In its closing argument, Westmark asked for total damages of $13,130,000—$3,429,000 for the delay from 1993 to 1996 and $9,571,130 for the delay from 1998 to 2003.[3] Verbatim Report of Proceedings (VRP) (Nov. 17, 2005) at 3819-20. The jury returned a verdict in favor of Westmark for $10,710,000. Burien appeals.

---

[3] Westmark requested a total of $13,130,000, but the correct total of the two sums is $13,000,130.

## ANALYSIS

### Chapter 64.40 RCW

■ ¶11 Burien argues that chapter 64.40 RCW provides the only method for recovering delay damages arising out of the permitting process. It further argues that Westmark has no claim for damages because it failed to satisfy the procedural requirements of the statute. Chapter 64.40 RCW, however, does not preclude Westmark from recovering damages under a common-law tort theory because the statute itself provides that it is "in addition to any other remedies provided by law," RCW 64.40.040, and Washington precedent allows common-law tort claims in addition to chapter 64.40 RCW claims.

¶12 In 1982, the legislature created a claim for damages on behalf of permit applicants under certain circumstances:

> Owners of a property interest who have filed an application for a permit have an action for damages to obtain relief from acts of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority, or relief from a failure to act within time limits established by law: PROVIDED, That the action is unlawful or in excess of lawful authority only if the final decision of the agency was made with knowledge of its unlawfulness or that it was in excess of lawful authority, or it should reasonably have been known to have been unlawful or in excess of lawful authority.

RCW 64.40.020(1). The statute also provides, "The remedies provided by this chapter are in addition to any other remedies provided by law." RCW 64.40.040. The purpose of chapter 64.40 RCW is to "provide a swift remedy for property damage caused by governmental agency action." *Wilson v. City of Seattle*, 122 Wn.2d 814, 825, 863 P.2d 1336 (1993). The statute contains exhaustion and time limit requirements: "Any action to assert claims under the provisions of this chapter shall be commenced only within thirty days after all administrative remedies have been exhausted." RCW 64.40.030.

¶13 The plain language of chapter 64.40 RCW provides that it is a remedy "in addition" to "other remedies provided by law" and is not the exclusive remedy for claims against an "agency" arising out of the permitting process. RCW 64.40.040. *City of Seattle v. Blume*, 134 Wn.2d 243, 947 P.2d 223 (1997) supports our interpretation of the statute. The Blumes sought a permit to construct an office and research facility. They anticipated a six- to nine-month permit processing time and that construction would begin in the fall of 1987. The project was opposed by two neighborhood groups, however, and after a series of delays, the Blumes withdrew their project in 1992 as no longer feasible. In seeking relief against Seattle, the Blumes alleged that "by delaying the permitting process," Seattle violated chapter 64.40 RCW. *Blume*, 134 Wn.2d at 249. The Blumes also brought a claim for tortious interference with a business expectancy. The Court of Appeals held that both claims were time barred under RCW 64.40.030. The Supreme Court disagreed, stating, "Petitioners' tortious interference claim is separate from their claim for damages pursuant to RCW 64.40.020. Thus, it was erroneous for the court to find that Petitioners' tortious interference claim was time barred under RCW 64.40.030." *Blume*, 134 Wn.2d at 251. The court further explained that intentional interference with a business expectancy is a "common-law tort" subject to the three-year statute of limitations. *Blume*, 134 Wn.2d at 251.

¶14 In dissent, Justice Talmadge maintained that tortious interference with a business expectancy should be abolished "where clearer remedial schemes such as RCW 64.40 and other statutory provisions exist." *Blume*, 134 Wn.2d at 267 (Talmadge, J., dissenting). The majority was not persuaded by this and declined to abolish tortious interference with a business expectancy in the context of permit applications. In light of *Blume* and other precedents, we hold that chapter 64.40 RCW does not bar claims for tortious interference with a business expectancy in the permit process context. *See also Wilson*, 122 Wn.2d at 823 ("RCW 64.40.020 is not merely a codification of preexisting

common-law tort remedies, but is a new cause of action not previously available. The statute expressly states the remedies provided are in addition to any other remedies provided by law."); *Callfas v. Dep't of Constr. & Land Use*, 129 Wn. App. 579, 595 n.7, 120 P.3d 110 (2005) ("[I]f the Callfases can state a claim for intentional interference with a business expectancy, that cause of action would not be barred by [the chapter 64.40 RCW] statute of limitations."). Chapter 64.40 RCW also does not bar Westmark's claim for negligent delay. Though the cases cited do not expressly discuss negligent delay, like tortious interference with a business expectancy, it is not barred by chapter 64.40 RCW because it is a common-law tort remedy. Moreover, the tortious interference claim was predicated at least in part on negligent delay.

¶15 Burien argues that *Callfas* and *Blume* are distinguishable because the plaintiffs in those cases alleged more than just permit delay. Westmark also alleged more than permit delay. As will be discussed below, Westmark argued to the jury that Burien interfered with its business expectancies for an improper purpose by singling out Emerald Pointe because of its opposition to apartment dwellers and its desire to appease a politician that lived nearby.

¶16 Burien also argues that RCW 64.40.040, which provides, "The remedies provided by this chapter are in addition to any other remedies provided by law," does not allow Westmark to pursue a tortious interference with a business expectancy claim because "remedies" are distinct from "rights." It cites *Pettis v. State*, 98 Wn. App. 553, 990 P.2d 453 (1999), which explained, " 'A "right" is a legal consequence deriving from certain facts, while a remedy is a procedure prescribed by law to enforce a right.' " *Pettis*, 98 Wn. App. at 561 (internal quotation marks omitted) (quoting *State v. McClendon*, 131 Wn.2d 853, 861, 935 P.2d 1334 (1997)). Contrary to Burien's argument, however, the Supreme Court has not interpreted chapter 64.40 RCW as being the sole means by which an action for negligent delay in the permitting process may be brought. *See Wilson*, 122

Wn.2d at 823 ("RCW 64.40.020 is not merely a codification of preexisting common-law tort remedies, but is a new cause of action not previously available. The statute expressly states the remedies provided are in addition to any other remedies provided by law.").

¶17 Finally, Burien contends that SEPA decisions, including the time necessary to make them, are discretionary and therefore should enjoy quasi-judicial immunity. In support, it cites *Dunstan v. City of Seattle*, 24 Wn. App. 265, 600 P.2d 674 (1979), but the plaintiffs in that case based their tort claim on the validity of the permit decision, not the delay in making the decision. Also, as explained above, the courts in *Blume*, *Wilson*, and *Callfas* acknowledged the validity of common-law tort claims arising out of delays in the permit application process. *See also Pleas v. City of Seattle*, 112 Wn.2d 794, 805, 774 P.2d 1158 (1989) (allowing a claim for tortious interference with a business expectancy claim based in part on the city "arbitrarily delaying" a building project).

### Jury Instructions

¶18 Burien contends that the trial court erred by instructing the jury that it could consider SEPA timelines in determining whether Burien was negligent and by allowing the jury to "decide which timeline applied to this case." Br. of Appellant at 50. The trial court instructed the jury that Westmark had the burden of proving "that Burien unreasonably delayed making a SEPA decision on Westmark's revised application." Instruction 7. Instruction 9, to which Burien does not cite or assign error, explained the meaning of a "SEPA decision" as follows:

> Upon receipt of a complete revised application, the responsible official for the City of Burien has a duty to make a SEPA decision. The responsible official may decide that the contents of the revised application: (1) did not constitute a substantial change to the original application, and would not require a threshold determination; (2) did constitute a substantial change to the original application but was still likely to have

significant adverse environmental impacts so that a new threshold determination was not required; or (3) did constitute a substantial change to the original application and likely lacked significant environmental impacts so that a new threshold determination is required.

Instruction 9. Instruction 10 explained to the jury, "The violation, if any, of a statute, ordinance, or administrative regulation is not necessarily negligence, but *may be considered by you as evidence in determining negligence.*" (Emphasis added.) And, "Such a violation may be excused if it is due to some cause beyond the violator's control, and that ordinary care could not have guarded against [it]." Instruction 10. Finally, instruction 11 informed the jury:

> *For any complete applications submitted prior to September 1, 1992 where a threshold determination is required:*
>
> A regulation in Washington provides that the responsible official shall make a threshold determination as close as possible to the time the agency is presented with a proposal. In most cases the time to make a decision should not exceed fifteen days. Complex proposals, those where additional information is needed, and/or those accompanied by an inaccurate checklist may require additional time. . . .

Instruction 11 also informed the jury:

> *For any complete applications submitted after August 31, 1992 where a threshold determination is required:*
>
> A regulation in Washington provides that the responsible official shall make a threshold determination as close as possible to the time an agency is presented with a proposal, but in any event, no later than ninety days after the application and supporting documentation and [sic] determined to be complete.

¶19 The court did not err by informing the jury of SEPA timelines. It did not instruct the jury that it had to choose which timeline applied. Instead, the court instructed the jury that after receiving a complete revised application, an agency is required to make a "SEPA decision." It further instructed the jury that a SEPA decision is, essentially, any

decision on the revised application, even if the decision is to not change the original threshold decision. In deciding whether Burien's delay in making a SEPA decision was negligent, the jury was instructed on two different timelines that have been used in Washington for threshold determinations. The jury was instructed that Burien's failure to meet these timelines was not necessarily negligence, but could be considered by the jury "as evidence in determining negligence." Instruction 10. And further, "Such a violation may be excused if it is due to some cause beyond the violator's control, and that ordinary care could not have guarded against [it]." Instruction 10. Stated another way, the jury was instructed that it could consider, or not consider, either timeline in determining whether Burien's delay in making a SEPA decision was negligent. Nothing directed the jury to conclude that a violation of a regulation was conclusive evidence of negligence. The jury was not bound by the timelines for another reason as well—it could have concluded that the delay was "beyond the violator's control" because Westmark was to blame for the delay due to its failure to pay fees and provide documents to Burien.

¶20 Burien also contends that instructing the jury on SEPA timelines was error because instruction 13 explained that the jury could find tortious interference with a business expectancy based on a violation of "a statute, a regulation, a recognized rule of common law, or an established standard of a trade or profession." Burien argues that this was prejudicial because the jury could find tortious interference based on a violation of SEPA timelines but was not instructed on which timeline applied to this case. We do not consider this argument because Burien makes it for the first time in its reply brief, thus not allowing Westmark an opportunity to respond. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); *see also In re Disciplinary Proceeding Against Kennedy*, 80 Wn.2d 222, 236, 492 P.2d 1364 (1972) ("Points not argued and discussed in the opening brief are deemed abandoned and are not open to consideration on

their merits."); *Dickson v. U.S. Fid. & Guar. Co.*, 77 Wn.2d 785, 787-88, 466 P.2d 515 (1970) ("Contentions may not be presented for the first time in the reply brief.").

### *Testimony of Robert Thorpe*

¶21 Burien argues that the jury instructions discussed above were particularly prejudicial because Westmark's expert witness on SEPA processing, Robert Thorpe, was allowed to testify about the law. We conclude that the court did not err in allowing Thorpe to testify because he merely testified as to how long, as a matter of fact, a SEPA decision takes and not on the legal deadlines for making such a decision. Additionally, Burien did not object to most of the testimony it argues was improper.

¶22 Thorpe testified that he had worked as a SEPA responsible official since 1971. Westmark's attorney asked Thorpe, "Well, have you made threshold determinations on apartment projects where there was originally a declaration of significance, and then there was a revision made so that you needed to make a new threshold determination?" VRP (Oct. 24, 2005) at 1474-75. Burien's attorney objected to the question, citing ER 403. The court overruled the objection because "[i]t's an attempt to lay foundation." *Id.* at 1475. Thorpe answered the question. Westmark's attorney then asked, "What is your practice, as a SEPA responsible official, for the amount of time you take to make a threshold determination?" *Id.* at 1475. Burien objected but the court overruled the objection. Thorpe then answered,

> We all started under the old rules of 15 days was the requirement, when the regulations first came out, and the standard practice is, normally, around 30 days, and in an extreme situation nowadays, you might see 90 days. But standard of practice is, in everything that I've ever been involved in, in either making a decision or the applications I've made for a number of clients, is around 30 to 45 days.

*Id.* at 1475-76. Burien again objected and moved to strike Thorpe's answer "on the basis that this is a matter of law for the Court to determine, not his standard of practice." *Id.*

at 1476. The court then heard argument in the absence of the jury.

¶23 After hearing argument, the court ruled that Thorpe could give his opinion on "the factual issue of how long, reasonably, a normal SEPA official would take" to make a SEPA determination and not on any legal deadline that might exist. *Id.* at 1486. After the jury returned, the court sustained Burien's objection, struck Thorpe's last answer (quoted above), and instructed the jury to disregard it. The court did not err by allowing Thorpe's testimony following the ruling because this testimony concerned how long it would normally take, as a matter of fact, to make a SEPA determination for a project like Emerald Pointe. It was based on his experience as a SEPA responsible official.

¶24 Burien also argues that the court erred by allowing Thorpe to testify that when King County accepted Westmark's revised plan, the original DS was no longer in place and a new threshold determination was required. Similarly, Burien argues that the court erred by allowing Thorpe to testify that standard practice was that when a government unit accepts a revision, this automatically withdraws the DS, so Burien should have begun processing the application even though Westmark may not have paid all of its fees. Burien did not object to any of this testimony, however, and it does not fall within the scope of its original objection to Thorpe's testimony about SEPA timelines. On appeal, Burien has not adequately briefed why reversal is required despite its failure to object during the trial. And like Thorpe's other testimony, this testimony was based on his experience as a SEPA responsible official.

¶25 Finally, Burien argues that the court erred by allowing Thorpe to testify about what information was necessary to complete Westmark's revised application. Again, Burien did not object when this testimony was given and, in fact, Thorpe gave this testimony in response to Burien's questions on cross-examination.

*Exclusion of Hearing Officer's Decision*

██ ¶26 Burien assigns error to the trial court's refusal to admit into evidence the hearing officer's decision upholding Burien's DS. Burien does not provide argument regarding this evidentiary exclusion beyond a statement in a footnote that it was erroneous and prejudicial because Westmark presented evidence that the revised application deserved a Determination of Nonsignificance (DNS) or a Mitigated Determination of Nonsignificance (MDNS). "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Palmer v. Jensen*, 81 Wn. App. 148, 153, 913 P.2d 413 (1996), *remanded on other grounds*, 132 Wn.2d 193, 937 P.2d 597 (1997). Moreover, the appropriateness of Burien's decision to issue a DS instead of a DNS or an MDNS was not relevant to this case because Westmark claimed that it was harmed by Burien's *delay* in issuing the DS, not by the DS itself.

*Tortious Interference with a Business Expectancy*

██ ¶27 Burien contends that the evidence was insufficient to support the jury's verdict in favor of Westmark on the tortious interference with a business expectancy claim. Westmark argues that it presented sufficient evidence that Burien interfered with its business expectancy for an improper purpose and by improper means. Specifically, Westmark argues that substantial evidence supported the inference that Burien singled out Westmark's project because it was an apartment building and because of pressure from a local politician (improper purpose) and improperly delayed review of the project (improper means). We affirm the trial court because, viewing the evidence in a light most favorable to Westmark, there was substantial evidence from which the jury could conclude that Burien acted for an improper purpose or by improper means.

¶28 "Overturning a jury verdict is appropriate only when it is clearly unsupported by substantial evidence."

*Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994). The "substantial evidence" test is met where there is sufficient evidence to persuade a rational, fair-minded person of the truth of the premise. *Winbun v. Moore*, 143 Wn.2d 206, 213, 18 P.3d 576 (2001). In reviewing the evidence, the appellate court does not reweigh the evidence, draw its own inferences, or substitute its judgment for the jury.

> "This court will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. The inferences to be drawn from the evidence are for the jury and not for this court. *The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered.*"

*Burnside*, 123 Wn.2d at 108 (citation omitted) (quoting *State v. O'Connell*, 83 Wn.2d 797, 839, 523 P.2d 872 (1974)).

¶29 The Washington Supreme Court has identified five elements necessary to make a claim for tortious interference with a business expectancy:

> "1. The existence of a valid contractual relationship or business expectancy;
> "2. That defendants had knowledge of that relationship;
> "3. An intentional interference inducing or causing a breach or termination of the relationship or expectancy;
> "4. That defendants interfered for an improper purpose or used improper means; and
> "5. Resultant damages."

*Commodore v. Univ. Mech. Contractors, Inc.*, 120 Wn.2d 120, 137, 839 P.2d 314 (1992) (quoting *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 28, 829 P.2d 765 (1992)). Burien argues that it did not interfere with Westmark's business expectancy for an improper purpose or by improper means.

¶30 Substantial evidence supports the conclusion that Burien intentionally interfered with Westmark's business expectancy for an improper purpose by singling out the Emerald Pointe project because it was to be an apartment building. "[A] cause of action for tortious interference arises from either the defendant's pursuit of an improper objective of harming the plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships." *Pleas v. City of Seattle*, 112 Wn.2d 794, 803-04, 774 P.2d 1158 (1989). The jury was instructed that " '[i]nterference for an improper purpose' means interference with an intent to harm the plaintiff Westmark." Instruction 13. A municipality may not "single out" a building project and use its permitting process to block the project's development. *See Pleas*, 112 Wn.2d at 806 ("There is ample evidence in the record to support the finding of the trial court that the City singled out Parkridge's project and applied its land use regulations in such a manner to block any apartment development on the property."). Although there was evidence to the contrary, there was evidence that Burien singled out the Emerald Pointe project because it was to be an apartment building.

¶31 The evidence in favor of Westmark showed that King County was close to making a SEPA decision around the time that the project was transferred to Burien. *See, e.g.*, VRP (Oct. 17, 2005) at 845-46 (King County stated and Westmark's architect, Roger Richert, believed that SEPA review of Westmark's revised application would proceed quickly). Burien incorporated on February 28, 1993. Shortly before incorporation, the city council passed a resolution imposing a moratorium on multifamily developments within the new city limits of Burien. Burien's first mayor, Arun Jhaveri, testified that the purpose of the moratorium was "to freeze not only new applications but multifamily development in general . . . ." Clerk's Papers (CP) at 5246. The attorney who represented Westmark through much of the permitting process, John Hempelmann, testified that Burien incorporated partly to stop the development of

apartment buildings. He also testified that he believed Burien opposed the Emerald Pointe project and requested that it be comprised of condominiums instead of apartments because Burien did not want to attract the kind of people who live in apartments. In 1998, Burien requested that Emerald Pointe be built as condominiums instead of apartments.

¶32 The evidence also showed that Burien was not forthright about its motives for taking on the Emerald Pointe project, giving credence to Westmark's theory that it was singled out. During the time of Burien's incorporation, there were around 100 project proposals pending with King County that were to occur within the area that eventually became Burien. Emerald Pointe was one of only a few projects transferred from King County to Burien. Burien's mayor testified that these projects were chosen because "these were projects of smaller or less complex nature" appropriate for the small staff of a newly incorporated city. CP at 5242. Burien argued at trial, however, that its delay in issuing a SEPA determination on the Emerald Pointe project was due in part to its complexity. *See, e.g.*, VRP (Nov. 17, 2005) at 2726 ("[I]t is complex. To clear eight acres of total vegetation, make cuts and fills that are stable to hold the building sites is not a simple operation[.]"). And Robert Garwood, the Burien planner who was initially assigned to the Emerald Pointe project, testified that he was told that Burien took over Emerald Pointe because it was controversial. The testimony of Burien's first director of community development, Gregg Dohrn, revealed that he had discussed Emerald Pointe with King County prior to Burien's incorporation and later labeled it a "hot project." VRP (Nov. 7, 2005) at 2839. Dohrn gave Emerald Pointe "priority status" but did not issue a SEPA determination in the two-year and seven-month period he was Burien's SEPA-responsible official. The evidence indicated that Dohrn's successor, Patrick Dugan, had decided to issue a DS for the project before he became Burien's SEPA-responsible official and before he had reviewed the project's files.

¶33 There was also evidence that Burien intentionally interfered with Westmark's business expectancy for another improper purpose by singling out Emerald Pointe because of then-state-representative Georgette Valle's opposition to the project. Westmark's principal, architect, and attorneys were aware of her opposition to the project while it was under King County's control. Westmark's land use attorney, Hempelmann, testified that he was concerned that she was meeting with Burien officials behind closed doors "trying to kill this project." VRP (Oct. 21, 2005) at 1381. The evidence showed that Valle lived close to the Emerald Pointe site and wanted to see it turned into a wildlife preserve.

¶34 Viewing all of this evidence in a light favorable to Westmark, the jury could have concluded that Burien singled out the Emerald Pointe project because of its general opposition to apartments and apartment dwellers and because of the pressure from Valle. As stated above, a municipality may not "single out" a building project and use its permitting process to block the project's development. *See Pleas*, 112 Wn.2d at 806.

¶35 If the evidence in favor of Westmark is believed, the jury also could have concluded that Burien used improper means (delay) to interfere with Westmark's business expectancy. As described above, there was evidence that King County was close to making a decision on Westmark's revised application. When the project was transferred to Burien, Burien gave it priority status. One of Westmark's architects, Roger Richert, testified that Westmark immediately provided Burien the documents it requested if such documents were available. As of November 1994, Burien had had the project for a year and a half and had not made a decision on the revised application.

¶36 John Hempelmann testified that he had been involved in hundreds of SEPA reviews with governmental entities and has encountered delay in getting threshold determinations, but he had never experienced a situation where it took three years. He further testified that this was

the longest, most frustrating, delayed process in the history of his career. Hempelmann was frustrated because Burien would not respond to Westmark's inquiries about the sufficiency of the environmental information provided. He also testified that Westmark would ask what specific issues needed to be addressed and Burien would not give straight answers.

¶37 Westmark's expert witness on SEPA processing, Robert Thorpe, testified that Burien took three years and four months to make a SEPA decision on Westmark's revised application. He also testified that in his experience, SEPA decisions typically take 30 days and at the most, 120 days. This evidence, if believed, was sufficient for the jury to find that Burien improperly delayed the project.

¶38 Burien argues that the delay in issuing a SEPA determination was due to Westmark's refusal to pay fees or submit documents on time. Westmark disputes this, arguing that it paid all fees and provided requested documents. The evidence on this is conflicting, and the jury could have reasonably concluded that the delay was not due to unpaid fees or Westmark's failure to provide documents. Thorpe testified that in practice, unpaid fees typically do not stop a SEPA determination from being made. He further testified that based on his experience and review of the file, it was unreasonable for Burien to stop processing Westmark's application while fees were being disputed. From this evidence, the jury could have concluded that Burien's delay was not due to unpaid fees or missing documents.

¶39 Burien also argues that there was no delay, as a matter of law, because it was not required to issue a SEPA determination since the revised application did not merit anything more than a new DS. Westmark's argument, however, is that Burien was required to make a decision on its revised application within a reasonable time, even if the decision was to maintain a DS. Burien even told Westmark as early as December 1994 that it had "no choice but to start with an environmental review and a SEPA determination

for the revised project." Ex. 124. And Burien eventually made a SEPA determination on the revised application.

¶40 Moreover, Burien was required to issue a SEPA determination on Westmark's revised application. Under WAC 197-11-310(1), "A threshold determination is required for any proposal which meets the definition of an action . . . subject to the limitations in WAC 197-11-600(3) concerning proposals for which a threshold decision has already been issued . . . ." " 'Proposal' means a proposed action." WAC 197-11-784. "A proposal exists at that stage in the development of an action when an agency is presented with an application . . . ." WAC 197-11-784. If there has already been a threshold determination, WAC 197-11-600(3)(b)(i) provides:

> Any agency acting on the same proposal shall use an environmental document unchanged, except in the following cases:
>
> . . . .
>
> (b) For DNSs and EISs, preparation of a new threshold determination or supplemental EIS is required if there are:
>
> (i) Substantial changes to a proposal so that the proposal is likely to have significant adverse environmental impacts (or lack of significant adverse impacts, if a DS is being withdrawn) . . . .

These WAC provisions do not demonstrate that Burien was required to issue a DNS or a MDNS. Rather, they imply that an agency acting upon a revised proposal must at least make a SEPA decision on that proposal, whether it be to stand by the original DS or issue a different threshold determination. It appears that Burien understood that it was obligated to at least notify Westmark of its official SEPA decision on the revised application, and it eventually did so in August 1996. Burien's argument on appeal seems to be that it would have been acceptable for it to issue no decision whatsoever on the revised application due to the original DS because it had determined that the changes to the Emerald Pointe project did not merit a DNS or an MDNS. But if that was Burien's decision, it had to be

communicated. Burien was at least obligated to notify Westmark of its official decision on the revised application, and Westmark was entitled to argue to the jury that Burien's delay in doing so was unreasonable.

¶41 Finally, Burien argues that the evidence of tortious interference with a business expectancy was insufficient because it was not similar enough to the evidence in *Pleas*. In *Pleas*, the City of Seattle (City) agreed to notify a group of concerned Capitol Hill residents of any demolition permit applications in the Capitol Hill area. The trial court found that this was " 'special treatment [that] constituted a form of favoritism.' " *Pleas*, 112 Wn.2d at 796 (quoting CP at 148-49). A developer applied for a permit, and the City notified the group. City officials met and decided to require an EIS before issuing demolition permits, "bypass[ing] the normal procedures" under SEPA, including the threshold determination process. *Pleas*, 112 Wn.2d at 796. The city council granted the neighborhood group's petition for a rezone of the site the developer wanted to demolish. The developer filed a petition for certiorari to review the rezone. The developer had also submitted the data requested for a building permit, but the City refused to take action on the permit application. The developer brought a mandamus action to compel the City to process the permit application. This action was consolidated with the action challenging the rezone.

¶42 The trial court ruled that the rezone was "unreasonable, arbitrary and capricious and therefore void" and that the City improperly refused to process the building permit application. *Pleas*, 112 Wn.2d at 797. The court ordered the City to process the building permit application promptly and in good faith. The developer filed a lawsuit against the City for intentional interference with a business expectancy. The lawsuit was stayed until after the developer obtained a building permit and developed the property.

¶43 After the court's order, the City notified the developer that a new EIS was required. The City refused to issue a demolition permit even though it had issued emergency

orders declaring that the structures the developer sought to demolish were "an imminent hazard." *Pleas*, 112 Wn.2d at 798. Over five years after the court ordered the City to process the permit application promptly, the City finally issued an EIS, and another year later it granted the developer a master use permit.

¶44 The facts in this case may not be as egregious as the facts in *Pleas*. *Pleas*, however, does not set the minimum standard for tortious interference with a business expectancy. Moreover, Burien exaggerates when it claims, "this case is nothing like *Pleas*." Br. of Appellant at 59. Here, Westmark alleged that Burien acted for an improper purpose by singling out Emerald Pointe because of its opposition to apartment dwellers and its desire to appease a state representative who lived near the development site. Similarly, the City of Seattle in *Pleas* acted for an improper purpose by singling out a particular development in order to please a neighborhood group. Here, Westmark alleged that Burien improperly delayed its revised application. Similarly, in *Pleas* the court found that Seattle's improper means was "arbitrarily delaying" the developer's project. The facts in *Pleas* are sufficiently analogous to the facts in this case. We affirm.

¶45 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

AGID and ELLINGTON, JJ., concur.

Reconsideration denied October 18, 2007.

Review denied at 163 Wn.2d 1055 (2008).