[No. 65549-3-I.   Division One.   May 21, 2012.]

Robin Parrott-Horjes, *Individually and as Personal Representative*, et al., *Appellants*, v. Marni G. Rice, *Respondent.*

*Paul A. Wallstrom*; and *Joseph A. Grube* (of *Ricci Grube Breneman PLLC*), for appellants.

*Brian K. Fresonke*, for respondent.

¶1 GROSSE, J. — One who acts in self-defense is not precluded from inheriting under the slayer rule. Here, the jury found that the defendant committed battery against the victim, but that she did so in self-defense. Intent to commit battery does not necessarily equate to intent to kill. The slayer rule requires a willful and unlawful killing. Here, the jury's verdict of self-defense negates the unlawfulness of the killing. Further, a victim of domestic violence can introduce evidence of an aggressor's prior bad acts of domestic violence in order to show the victim's state of mind, an element of self-defense. The trial court is affirmed.

## FACTS

¶2 Marni Rice and Michele Parrott were in a committed relationship. The two resided together with Parrott's then 16-year-old son, Andrew, and then 20-year-old daughter, Alexandria. Parrott died as a result of a subdural hematoma incurred on November 5 or 6, 2007.

¶3 Rice and Parrott were planning to move to Idaho at the end of the month and were engaged in purchasing a bar. On November 5, Parrott returned from work with a half gallon of vodka; after checking her e-mail on the computer in the bedroom, she discovered that more money was required to complete the real estate transaction in Idaho. Rice testified that Parrott was upset and drinking. Rice saw Parrott pour two drinks before Parrott called her grandfather to ask to borrow additional funds. The grandfather refused and Parrott became upset. Parrott also discovered that Rice had been looking at a gay singles web site in Idaho and angrily demanded to know why Rice was viewing the site. Parrott became abusive and slapped Rice across the face. Parrott also acted aggressively toward Rice's dog. When Parrott left the bedroom, Rice locked the double doors to keep Parrott out. Parrott became angry that Rice had locked the doors and broke open both doors. Parrott then pulled a gun out of the closet and waived it around. Rice

yelled at Parrott to put the gun down and then Parrott left the room. Rice put the gun in a box in another room, returned to the bedroom, repaired the doors, and closed and locked them again. Angered that Rice had again locked the bedroom doors, Parrott started counting and yelling at Rice to let her in or she would break down the doors again. Rice jumped off the bed and placed her hands on the doors in an effort to keep Parrott out. The doors broke open and Rice testified that Parrott fell backwards. Rice saw Parrott fall back into the wall, turn toward the living room, and then fall on her left side.

¶4 Alexandria testified that she saw Rice push her mom into the wall and it was after that that her mom became aggressive toward her and Andrew. Alexandria testified that her mother was drinking, but not drunk. At some point Alexandria called the police, who came and suggested that Alexandria leave the house. Alexandria left at approximately 1:00 a.m. and did not return until 7:00 a.m. Shortly after Alexandria left, the police came by the house a second time to check on the situation. Rice answered the door and the police asked to speak with Parrott. Rice testified that Parrott had a drink in her hand. The police were there for only a few minutes and Rice went to bed.

¶5 Andrew testified that his mother seemed a little bit drunk and he saw her lying in the hallway. He assumed she had just passed out and got a pillow and blanket for her. Then, he went to bed. When Alexandria returned the next morning, she found her mother lying in the hallway with a blanket over her and a pillow under her head. Alexandria thought that Parrott had gotten drunk and passed out the night before. About 1:00 p.m., Andrew woke up and found his mother was blue. He told Rice, who administered CPR (cardiopulmonary resuscitation) while Alexandria called 911. Parrott died a few days later.

¶6 Angela Severance, Parrott's half sister, testified that she had observed holes in the walls of the house and that she had seen Rice with a black eye.

¶7 Parrott and Rice maintained life insurance policies naming each other as beneficiary.[1] Parrott had also designated Rice as the beneficiary of a savings plan she maintained through her federal employer. Robin Parrott-Horjes, Parrott's aunt, is the contingent beneficiary on the life insurance policy and the personal representative of Parrott's estate.

¶8 No criminal charges have been filed against anyone for Parrott's death. Parrott-Horjes sought damages for wrongful death and to prevent Rice from taking money under the life insurance policy based on the federal common law "slayer rule." Rice filed a CR 12(b)(6) motion requesting the trial court dismiss Parrott-Horjes' claim for constructive trust on the life insurance proceeds for the benefit of Parrott's children on federal preemption grounds. The trial court granted the motion and the remaining claims were tried before a jury. The jury returned a verdict in Rice's favor and Parrott-Horjes appeals.

## ANALYSIS

### Self-Defense and Prior Bad Acts

¶9 "A defendant is entitled to a self-defense instruction only if he or she offers credible evidence tending to prove self-defense."[2] "To establish self-defense, a defendant must produce evidence showing that he or she had a good faith belief in the necessity of force and that that belief was objectively reasonable."[3]

¶10 Parrott-Horjes argues that because Rice stated in an admission that she did not push Parrott, Rice is

---

[1] As a result of an agreed settlement of Rice's claim against Metropolitan Life Insurance, the insurance company placed the $405,200.00 of insurance proceeds, together with $12,157.22 of prejudgment interest, into the court registry.

[2] *State v. Dyson*, 90 Wn. App. 433, 438, 952 P.2d 1097 (1997) (citing *State v. McCullum*, 98 Wn.2d 484, 488, 656 P.2d 1064 (1983)); *see also State v. Hendrickson*, 81 Wn. App. 397, 401, 914 P.2d 1194 (1996).

[3] *Dyson*, 90 Wn. App. at 438-39.

precluded from arguing self-defense. Although Rice denied pushing, she did testify that she intentionally pushed back on the bedroom doors to protect herself from Parrott's assault and that that force repelled Parrott backwards into the hallway wall. Alexandria testified that she saw Rice push Parrott. Rice had already been slapped by Parrott. Parrot was intoxicated and the jury could conclude that Rice reasonably believed that she would be harmed if Parrott gained entrance to the bedroom. Rice's claim of self-defense was not precluded because she did not think she was the cause of Parrott's death. She admitted she held the doors against Parrott's assault and that when the doors popped open, Parrott fell backwards into the hall. This was sufficient for the court to permit a claim of self-defense.

¶11 Parrott-Horjes also argues that the trial court erred in denying her motion in limine to prohibit evidence of Parrott's prior acts of domestic violence under ER 404(b).[4] Under ER 404(b), evidence of other crimes, wrongs, or acts is generally inadmissible to prove character or show action in conformity therewith.[5] But such evidence is admissible for other purposes. When the trial court ruled that Rice was entitled to put forth evidence on self-defense, Rice's state of mind became an issue. Evidence of prior bad acts is admissible to prove that someone reasonably feared injury, in effect establishing their state of mind at the time of the act.[6]

¶12 Here, the evidence served a legitimate purpose, it was relevant to prove an element of Rice's affirmative

---

[4] ER 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[5] *State v. Grant*, 83 Wn. App. 98, 105, 920 P.2d 609 (1996).

[6] *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008) (evidence of past domestic violence and fighting admissible to assist jury in judging recanting victim's credibility and state of mind).

defense, and its probative value outweighed any prejudicial effect. A trial court's admission of evidence is reviewed for abuse of discretion.[7] Evidence about Parrott's prior acts of domestic violence was specifically addressed in the motions in limine. After a hearing, the trial court made findings that the probative value of the evidence with regard to Rice's state of mind was not outweighed by the prejudicial nature of the evidence. After finding that the incidents of domestic violence had occurred, the court admitted evidence of other acts of Parrott's prior conduct, including intoxication, confrontational attitude, and other incidents of domestic violence with other family members. Further, when requested, the court offered a limiting instruction that such evidence was offered to prove Rice's state of mind.[8] Evidence of Parrott's prior violent misconduct was relevant to the issue of whether Rice's apprehension and fear of bodily injury was objectively reasonable, one of the required elements of her affirmative defense. The trial court did not abuse its discretion in admitting such evidence.

¶13 The evidence was sufficient to support the jury's verdict of self-defense. An appellate court will overturn a jury verdict "only when it is clearly unsupported by substantial evidence."[9] Substantial evidence is "sufficient evidence to persuade a rational, fair-minded person of the truth of the premise."[10]

¶14 The presence of conflicting evidence, without more, does not undermine a jury's verdict. When reviewing the evidence, an appellate court does not "reweigh the evidence, draw its own inferences, or substitute its judgment for the

---

[7] *Magers*, 164 Wn.2d at 181.

[8] *State v Powell*, 166 Wn.2d 73, 81, 206 P.3d 321 (2009); *see also State v. Barragan*, 102 Wn. App. 754, 759, 9 P.3d 942 (2000) (holding that a defendant's prior misconduct was admissible to show the victim's state of mind in prosecution for harassment).

[9] *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 108, 864 P.2d 937 (1994).

[10] *Westmark Dev. Corp. v. City of Burien*, 140 Wn. App. 540, 557, 166 P.3d 813 (2007).

jury."[11] Parrott-Horjes' appeal essentially requests this court to reassess the credibility of the testimony and other evidence. It is the jury, not the court, that is charged with assessing the facts. Here, the evidence was legally sufficient to support the jury's verdict.

## Jury Verdict

¶15 Parrott-Horjes argues that the jury verdict was internally inconsistent. She contends that for the jury to find that Rice committed a battery, which was the proximate cause of Parrott's death, it had to find that Rice intentionally caused the death of Parrott. She is incorrect. The jury's verdict is not inconsistent. A review of special verdicts necessarily requires the court to reconcile the jury's answers when possible.[12]

¶16 Here, the jury returned the following special verdicts:

**QUESTION 1:** Did the defendant Marni Rice commit battery upon Michele Parrott, deceased?

**ANSWER:** (Write "yes" or "no") Yes

(*INSTRUCTION*: If you answered "yes" to Question 1, answer Question 2. If you answered "no" to Question 1, answer Question 5.)

**QUESTION 2:** Was battery committed by defendant Marni Rice a proximate cause of Michele Parrott's death?

**ANSWER:** (Write "yes" or "no") Yes

(*INSTRUCTION*: If you answered "yes" to Question 2, answer Question 3. If you answered "no" to Question 2, answer Question 5.)

**QUESTION 3:** Was the defendant Marni Rice acting in self-defense when she committed battery?

**ANSWER:** (Write "yes" or "no") Yes

---

[11] *Westmark*, 140 Wn. App. at 557.

[12] *Alvarez v. Keyes*, 76 Wn. App. 741, 743, 887 P.2d 496 (1995).

(*INSTRUCTION*: If you answered "yes" to Question 3, answer Question 5. If you answered "no" to Question 3, answer Question 4.)

**QUESTION 5:** Did the defendant Marni Rice intentionally or recklessly cause the death of Michele Parrott?

*ANSWER:* (Write "yes" or "no") <u>No</u>

(*INSTRUCTION*: If you answered "yes" to Question 5, answer Question 6. If you answered "no" to Question 5, sign this verdict.)

The verdict form asked the jury to separately determine whether Rice committed battery, a proximate cause of Parrott's death, and then to determine whether the act was done in self-defense. The jury was then asked to rule on the second claim—whether Rice intentionally or recklessly caused the death which would preclude her enrichment under the common law slayer rule. These are not inconsistent.

¶17 Jury instruction 2 outlined the claims set forth. Jury instruction 14 informed the jury that it "should decide each claim [of] the plaintiff separately as if it were a separate lawsuit. The instructions apply to all claims unless a specific instruction states that it applies only to a specific claim."

¶18 "Battery" was defined in jury instruction 9 as "the intentional infliction of harmful bodily contact upon another." The jury found that Rice acted to protect herself when it found she acted in self-defense. The jury's finding that Rice intended to inflict bodily harm does not necessarily mean that Rice intended the result of such harm, i.e., Parrott's death. She did not intend to cause the death and, because the jury found she acted in self-defense, her action did not recklessly cause Parrott's death.

¶19 Courts have long held that the slayer rule prevents a killer from recovering the victim's life insurance benefits.

*See N.Y. Mut. Life Ins. Co. v. Armstrong*[13] ("It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken."). The principle is also well established in Washington law, where a person who participates in the willful and unlawful killing of a person is prohibited from receiving any benefit resulting from his act.[14] But a death as a result of self-defense is neither felonious nor unlawful. See *In re Estate of Kissinger*, wherein our Supreme Court distinguished insanity from self-defense, noting that self-defense "is a lawful act despite the fact it may have lethal consequences."[15] Here, too, Rice's actions were lawful.

Constructive Trust

¶20 Parrott designated Rice as the beneficiary under a life insurance policy through her employment with the United States Postal Service, a group policy issued by Metropolitan Life Insurance Company pursuant to the Federal Employees' Group Life Insurance Act of 1954 (FEGLIA).[16] Parrott-Horjes argues that a constructive trust should be established in favor of the children because of Rice's statements in her deposition and in a letter she wrote to the police.

¶21 The trial court granted Alexandria and Andrew's motion to dismiss them as parties to the action. The motion expressly stated that "to the extent Alexandria Parrott or Andrew Duncan have any type of right to the interpleaded funds, such a right is hereby expressly disclaimed." In its oral ruling on the motion, the court specifically stated that this would "resolv[e] the issue of any claims to the life

---

[13] 117 U.S. 591, 600, 6 S. Ct. 877, 29 L. Ed. 997 (1886).

[14] Ch. 11.84 RCW.

[15] 166 Wn.2d 120, 130, 206 P.3d 665 (2009); *see also* RCW 9A.16.020 (defining lawful use of force).

[16] 5 U.S.C. §§ 8701-8716.

insurance policy that would be adjudicate[d] here." Clearly this removed any legal or equitable right the children would have to the life insurance proceeds.

¶22 Further, FEGLIA is a federal insurance program administered under federal law. Anticipating potential state conflicts, Congress specifically provided that the provisions of any contract under FEGLIA,

> which relate to the nature or extent of coverage or benefits . . . shall supersede and preempt any law of any State . . . to the extent that the law or regulation is inconsistent with the contractual provisions.[17]

¶23 In *Estate of Hanley v. Andresen*,[18] this court held that even though a dissolution decree purported to divest the named beneficiary of rights under FEGLIA, the failure to properly execute any designation change entitled the named beneficiary to proceeds as against competing claimants. Since a legal claim cannot divert the monies from a named beneficiary, neither can a constructive claim.

¶24 Nevertheless, Parrott-Horjes argues that Rice is entitled to receive the benefits under the life insurance policy, but that she holds those benefits in a constructive trust for the children. This argument is made even though those same children denied any right to those life insurance proceeds. Parrott-Horjes cites a Missouri case, *Kidd v. Pritzel*,[19] which held that state claims in equity were not preempted by FEGLIA. But the federal authorities, as well as this court, reach the unavoidable conclusion that FEGLIA preempts state laws, including equitable remedies. In *Metropolitan Life Insurance Co. v. Zaldivar*,[20] the court held that FEGLIA precludes the awarding of a constructive trust because it "would require that the proceeds

---

[17] 5 U.S.C. § 8709(d)(1).

[18] 39 Wn. App. 377, 380-81, 693 P.2d 198 (1984).

[19] 821 S.W.2d 566 (Mo. Ct. App. 1991).

[20] 337 F. Supp. 2d 343, 347 (D. Mass. 2004).

of the policy be distributed to someone other than the beneficiary," thus conflicting with FEGLIA's express wording. The *Zaldivar* court noted:

> Numerous federal courts have held that, where state laws conflict with FEGLIA's provisions, FEGLIA preempts state law. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 367 (8th Cir. 1997) ("It has been consistently held in regard to FEGLIA that a divorce decree cannot operate as a waiver or restriction of an insured's right to change the beneficiary when federal regulations conflict."); *Metropolitan Life Ins. Co. v. Sullivan*, 96 F.3d 18, 20 (2d Cir. 1996) ("To the extent that New York law allows for a change of beneficiaries by third parties, it conflicts with FEGLIA and is preempted."); *Metropolitan Life Ins. Co. v. Christ*, 979 F.2d 575, 580 (7th Cir. 1992) (". . . FEGLIA preempts the divorce decree and constructive trust remedy . . . ."); *Dean v. Johnson*, 881 F.2d 948, 949 (10th Cir. 1989) ("The state domestic relations court order ostensibly restricts the federal insured's right to designate a beneficiary and thus cannot be valid under FEGLIA."); *O'Neal v. Gonzalez*, 839 F.2d 1437, 1440 (11th Cir. 1988) (". . . Congress intended to establish . . . an inflexible rule that the beneficiary designated in accordance with the statute would receive the policy proceeds, regardless of other documents or the equities in a particular case."). These federal authorities, particularly the Seventh Circuit's *Christ* decision, powerfully underline the unavoidable conclusion that FEGLIA completely preempts state laws, including equitable remedies, with the effect, in this case, that Beverly Zaldivar's motion must be allowed.[21]

Rice is the designated beneficiary and federal law preempts a state action.

¶25 Accordingly, the trial court is affirmed.

Cox and Schindler, JJ., concur.

Review denied at 176 Wn.2d 1008 (2012).

---

[21] 337 F. Supp. 2d at 346 (alterations in original) (footnote omitted).